676 So.2d 582 (1996)
Jacquelyn M. BYNUM
v.
CAPITAL CITY PRESS, INC.
No. 95-C-1395.
Supreme Court of Louisiana.
July 2, 1996.
Rehearing Denied September 3, 1996.
*583 Robert Everage Hill, Baton Rouge, for Applicant.
Maurice Blake Monrose, Lafayette, for Respondent.
KIMBALL, Justice.[*]

ISSUE
We granted claimant's writ application in this case to resolve a conflict between the circuits regarding La.R.S. 23:1031.1.E(c). We are called upon specifically to determine whether or not an actual, medical "diagnosis" is required under that statute to determine if an employee "knows or has reasonable grounds to believe that the disease is occupationally related" so as to commence the running of prescription under the statute. Because we find that an actual "diagnosis" is not required by the statute, we affirm the court of appeal opinion in this case affirming the hearing officer's granting of defendant's exception of prescription and to the extent other court of appeal cases hold to the contrary, hereby overrule those cases.

PROCEDURAL HISTORY
On February 11, 1991, claimant filed a claim with the Office of Worker's Compensation alleging she had suffered a work-related injury as a result of inhaling fumes and dust during the period of her employment in the pressroom at Capital City Press from January 13, 1977 to September of 1985. Defendant filed an exception of prescription which was granted by the hearing officer. After the court of appeal reversed the hearing officer's granting of the exception of prescription because of a lack of written notice to the claimant's attorney, re-trial on the exception was held. The exception was again *584 granted, the court of appeal affirmed,[1] and this court granted claimant's writ application.[2]

FACTS
Claimant began working as an apprentice pressman for Capital City Press on January 13, 1977. She testified she was exposed daily to fumes from inks, dyes, dust and chemicals, and that she left work every day covered with ink on her skin and clothes as a result of her exposure to the ink fumes. Ms. Bynum, who had a history of recurrent pneumonia in 1971, 1972, 1973 and 1983 according to the medical records introduced into evidence, was hospitalized by her treating physician, Dr. Lott, in February of 1984 after she began feeling bad and coughing up dark green sputum, which, according to her testimony below was "filled with ink." The medical records show claimant was diagnosed as having cystic bronchiectasis of the right middle lobe and cylindrical bronchiectasis of both lower lobes.
Ms. Bynum was again hospitalized in August of 1984 for her bronchiectasis and underwent a right middle lobectomy on September 13, 1984. According to claimant's testimony, after returning to work at Capital City Press around March of 1985, she continued to have respiratory problems and continued to cough up sputum which she testified was "filled with ink". She quit her job with Capital City Press in September of 1985.[3]
In October of 1985, Ms. Bynum was hospitalized again for pneumonia and chronic bronchitis. In December of 1985, she sought treatment at the University of Texas Health Science Center in Houston, Texas. Her two doctors there, Drs. Dantzker and Glann, in a letter to Dr. Lott, confirmed the diagnosis of bronchiectasis. The letter indicated that Ms. Bynum was advised that her current level of disability precluded her from working at her current tasks. Ms. Bynum testified below that the doctors additionally told her she was totally disabled and that she could no longer work in any environment containing smoke, dust or fumes.
Ms. Bynum was later seen by Dr. Perret on November 16, 1987. Dr. Perret's report indicates claimant informed him she worked at Capitol City Press "and had to work around ink fumes which aggravated her cough." Dr. Perret diagnosed chronic bronchiectasis with persistent bronchitis. His report further indicates he considered Ms. Bynum to be completely disabled but felt she may be able to work with numerous limitations including "no exposure to irritating or toxic chemicals or fumes, all of which might aggravate her bronchiectasis" and a "controlled indoor environment." Ms. Bynum testified below that Dr. Perret told her she could not go back to working in the environment of the printing room.
After Dr. Lott died in July of 1988, claimant began treatment with Dr. McClay in August of 1988. Dr. McClay's notes from the first appointment indicate claimant told Dr. McClay "she had been totally well prior to onset of illness that lead (sic) to a lobectomy in 1984" and that "her problem began after she took a job working on the newspaper, and such had followed her coughing up ink." Dr. McClay's notes from Ms. Bynum's September 16, 1988 appointment and her October 28, 1988 appointment indicate claimant told him she was "still expectorating ink" and still "coughing up streaks of black ink" even though this was three years after she had stopped working for Capital City Press. Additionally, Dr. McClay testified during the hearing on prescription that claimant "kept stating [during her appointments] that she was inhaling black ink fumes from the presses and that at times, they would make her dizzy and weak and the like" and that this condition started several months after claimant started working at Capital City Press.
In a letter dated September 16, 1988 from Dr. McClay to Ms. Dreher, the claims examiner for Reliance Standard Life Insurance *585 Company, plaintiff's disability insurer, Dr. McClay noted he considered Ms. Bynum to be 100% disabled and that his "impression" of her condition was "disability due to occupational lung disease secondary to inhalation of fumes, ink, etc." Dr. McClay indicated in the letter that he needed Ms. Bynum's prior medical reports. During his testimony below, Dr. McClay explained that his conclusion in the letter to Ms. Dreher was only an "impression" and not a "diagnosis" because he did not have enough information at the time to make a diagnosis. Later, however, Dr. McClay testified that a patient's history as given by the patient is 90% of a diagnosis. In any case, he testified he was finally able to make a complete diagnosis only after he examined claimant's brothers to rule out any hereditary lung problems. Thus, he testified he did not give claimant a "diagnosis" of occupational lung disease until October of 1990. Dr. McClay did testify, however, that he "probably may have" discussed his "impression" of occupational lung disease with Ms. Bynum in 1988 and that he did tell her at that time that the "inhalation of the fumes... could be" the cause of her problems.
In a report dated December, 1988, also mailed to Ms. Dreher, Dr. McClay reiterated his finding that claimant is 100% disabled by her pulmonary problems and states that if she could work at all, it would have to be in a controlled indoor environment. In a Physical Capacities Form filled out by Dr. McClay for IntraCorp, an agent of Reliance, on July 26, 1989, Dr. McClay stated that claimant's work restrictions included "dust, dampness, chemicals, fumes, gases" and that claimant would have to have "climate control." In a report filled out by Dr. McClay's office for Equifax in December of 1989, the "diagnosis" of claimant's condition is given as "chronic lung disease secondary to environmental hazards and ... chronic bronchitis."
Although at one point during the hearing Ms. Bynum testified no physician ever told her she had a "work-related" or "occupational disease" until Dr. McClay told her she had an occupational disease in October of 1990, the following exchange took place on cross-examination by Mr. Monrose:
Q: The doctors before [before Dr. McClay]and I'm just going to say "the doctors before," and if you want to single them out, you're more than welcomed to do so. Some of the doctors before had already told you that your problem was related to the conditions at work, correct?
A: Yes.
On redirect, claimant was asked by Mr. Hill:
Q: Ms. Bynum, who, if anyone, prior to Dr. McClay told you that your disease was work-related?
A: None of the doctors told me that the disease was work-related.
THE COURT: But you just testified
MR. HILL: Your honor, she misunderstood the question.
A: I misunderstood
MR. MONROSE: Wait a minute. Objection, your honor.
A: What he was asking.
THE COURT: You just testified that a number of doctors told you that your illness was due to conditions on your job. We're quibbling here. Work-related is a term-of-art used in workers' compensation.
A. Oh, okay.
THE COURT: You were asked the question, did any of your doctors tell you that your condition was caused by the conditions of your work. You said, "yes." Now, is that true?
A. Yes.

ANALYSIS
La.R.S. 23:1031.1.E. provides:
All claims for disability arising from an occupational disease are barred unless the employee files a claim with his employer within six months of the date that:
(a) The disease manifested itself.
(b) The employee is disabled from working as a result of the disease.
(c) The employee knows or has reasonable grounds to believe that the disease is occupationally related.
Notice filed with the compensation insurer of such employer shall constitute a claim as required herein.
*586 We note that subparts (a), (b) and (c) are not separated either by the disjunctive article "or" or by the conjunctive article "and". Prior court of appeal cases have continually held that the existence of all three factors is necessary for the prescriptive period of this statute to commence. See, e.g., Thornell v. Payne and Keller, Inc., 442 So.2d 536, 540-41 (La.App. 1st Cir.1983), writ denied, 445 So.2d 1231 (La.1984); Brown v. City of Monroe, 521 So.2d 780, 781 (La. App.2d Cir.1988); McDonald v. New Orleans Private Patrol, 569 So.2d 106, 107 (La.App. 4th Cir.1990); Naquin v. Johns-Manville Sales Corp., 456 So.2d 665, 666 (La.App. 5th Cir.1984). Not only is this the proper interpretation to be given this article in light of the well-settled principle that the provisions of the worker's compensation scheme should be liberally interpreted in favor of the worker, but it is also proper in light of the absurd consequence which would result if the three sub-parts were interpreted to be disjunctive. Such an interpretation would require the employee to file a claim seeking disability benefits within 6 months from the date the disease manifests itself (subpart (a)) even though he might not yet be disabled from working as a result of the disease (subpart (b)). Thus, the six month prescriptive period does not begin to run until the point at which the disease has manifested itself, the employee has become disabled from working as a result of the disease, and the employee knows or has reasonable grounds to believe the disease is occupationally related.
In the instant case, it is readily apparent from the prior recitation of facts, and indeed the parties do not appear to dispute, that Ms. Bynum's disease manifested itself as early as 1984 when she was hospitalized twice, diagnosed as having bronchiectasis, and underwent a lobectomy. Furthermore, it is apparent the claimant was disabled from working as a result of the disease as early as September of 1985 when she had to quit her job with Capital City Press because of her condition. Doctors Dantzker and Glann of the University of Texas Health Science Center in Houston informed claimant she was disabled in December of 1985, Dr. Perret found claimant to be completely disabled in November of 1987, and Dr. McClay indicated in his report of September 16, 1988 that claimant was completely disabled.
The issue to be resolved then is a determination of the point at which claimant knew or had reasonable grounds to believe her disease was "occupationally related" in order to trigger the commencement of the six month prescription under La.R.S. 23:1031.1.E. The hearing officer, who heard the testimony of Ms. Bynum and of Dr. McClay and reviewed the reports of claimant's other doctors, found as fact that all of claimant's doctors informed her that she should not return to work in her position at Capital City Press and that her disability was "occasioned" by conditions at her job. Accordingly, he concluded claimant knew she was totally disabled due to an occupational disease by September of 1988, and therefore, the claim filed on February 1, 1991 was prescribed. The standard of review for findings of fact by a hearing officer in a worker's compensation case is "manifest error." Doucet v. Baker Hughes Production Tools, 93-3087 at 4 n. 3 (La. 3/11/94), 635 So.2d 166, 168 n. 3; Alexander v. Pellerin Marble & Granite, 93-1698 at 5-6 (La. 1/14/94), 630 So.2d 706, 709-10 (and cases cited therein); Charles v. Travelers Insurance Co., 627 So.2d 1366, 1372 (La.1993).
The first circuit court of appeal found the hearing officer's finding that claimant knew or had reasonable grounds to believe her disease was occupationally related no later than September of 1988 to be supported by the record evidence. "Plaintiff was diagnosed with chronic bronchiectasis and told she could work only in a climate controlled environment as early as November of 1987. We further believe that a reasonable person would know that her condition was work related when she began coughing up ink, as the plaintiff testified she did." Bynum, supra n. 1, 94-1658 at 7, 655 So.2d at 492. The court went on to state:
We decline to follow the reasoning of Williams v. Public Grain Elevator of New Orleans, Inc., 417 So.2d 398 (La.App. 4th Cir.) writ not considered, 422 So.2d 160 (La.1982), and Perkins v. Asplundh Tree *587 Expert Company, 26-457-CA (La.App.2d Cir. 1/25/95); 650 So.2d 1198, wherein the courts concluded that the claimants did not have knowledge of the relation of their diseases to their employment until diagnosed as having occupational diseases by experts. We believe that the determination of knowledge should be made upon all the facts presented and not strictly upon a definitive diagnosis by a physician. The language of the statute does not require knowledge that the claimant have a reasonable belief that his disease is an occupational disease, but rather requires only a reasonable belief that the disease is work related.
Bynum, Id. at 7-8, 655 So.2d at 492-93.
The Williams and Perkins cases referred to by the court of appeal directly conflict with the instant court of appeal opinion. In Williams v. Public Grain Elevator of New Orleans, Inc., 417 So.2d 398 (La.App. 4th Cir.), writ denied, 422 So.2d 160 (1982), plaintiff worked for defendant from 1952 through January 31, 1980 when he was forced to quit work because of shortness of breath and weakness. On May 21, 1981, plaintiff was examined by a pulmonary specialist and told he had pneumoconiosis, an occupational disease caused by exposure to grain dust and pesticides. On August 12, 1981, plaintiff filed a workmen's compensation suit. Defendant argued the suit was prescribed because defendant, more than six months prior to the filing of the suit, had reasonable grounds to believe his disease was occupationally related because of his shortness of breath and weakness and because he had complained to defendant about failing to provide workers with protective masks. Furthermore, plaintiff had been receiving medical treatment prior to the diagnosis of the condition as pneumoconiosis on May 21, 1981. The court of appeal found the trial court erred in granting the exception of prescription. Because plaintiff had to prove the existence of an occupational disease at trial with expert testimony, the court believed it absurd to require a layman to "diagnose his illness as an occupational disease for purposes of prescription." Therefore, because plaintiff did not know or have reasonable grounds to believe he had an occupationally related disease until the specialist diagnosed him as having such, the claim was not prescribed.
Likewise, in Perkins v. Asplundh Tree Expert Company, 26-457 (La.App.2d Cir. 1/25/95), 650 So.2d 1198, claimant worked intermittently for defendant using power chain saws from 1973 through 1987. During that time, he suffered cramps and pain in his hands. The symptoms disappeared each time he quit and performed jobs for other employers. In April of 1991, claimant began working again for defendant, but the pain in his hands became so severe that the had to leave work on June 14, 1991. On June 15, 1991, claimant went to a doctor and was diagnosed with carpal tunnel syndrome. He filed a workers compensation claim on August 28, 1991. The hearing officer granted defendant's exception of prescription under La.R.S. 23:1031.1.E. The court of appeal held that although defendant knew or should have known that the symptoms he experienced over the several years were occupationally related, the disease did not "manifest" itself under La.R.S. 23:1031.1.E.(a) until claimant was diagnosed as having an occupational disease. The court based its conclusion, as did the Williams court, on the fact that because claimant would not have been able to meet his burden of proving entitlement to compensation at trial merely by recounting his symptoms in the absence of supporting medical diagnosis, prescription should not begin to run against him absent a diagnosis.
We believe the instant court of appeal opinion more closely reflects the proper interpretation to be given to La.R.S. 23:1031.1.E. for several reasons. When an employee is given a diagnosis by a doctor that he has a disease and is told the disease is occupationally related, that employee "knows" his "disease is occupationally related" for purposes of subpart (c) of this statute. To require in every case an actual diagnosis that an employee has a disease which is occupationally related in order to trigger the commencement of prescription would render the remaining language of subpart (c), which states alternatively that the six months period begins to run from the *588 date the employee "has reasonable grounds to believe that the disease is occupationally related," meaningless. Certainly the legislature, had it intended for prescription to commence under La.R.S. 23:1031.1.E.(c) only upon an actual professional diagnosis of an occupationally related disease, could easily have said so. Indeed, the legislature has indicated its ability to condition receipt of benefits on an actual diagnosis of a certain condition as reflected in La.R.S. 23:1021(7)(d) dealing with compensability of a mental injury or illness, which states:
No mental injury or illness shall be compensable under either Subparagraph (b) or (c) unless the mental injury or illness is diagnosed by a licensed psychiatrist or psychologist and the diagnosis of the condition meets the criteria as established in the most current issue of the Diagnostic and Statistical Manual of Mental Disorders presented by the American Psychiatric Association.
Although receipt of an actual diagnosis of a disease which is occupationally related will in every case trigger the commencement of the prescriptive period, (provided, of course, that subparts (a) and (b) have also been met), such is not the sine qua non in all cases; rather, in cases where the employee has reasonable grounds to believe his disease is occupationally related, prescription can commence even absent such an official medical diagnosis. To the extent that the Williams and Perkins court of appeal opinions held as a matter of law, either implicitly or explicitly, that prescription cannot begin to run under La.R.S. 23:1031.1.E until the claimant has an actual medical diagnosis that his disease is occupationally related, those opinions are overruled.[4]
Having determined that a medical diagnosis of an occupationally related disease is not necessary in every case in order to trigger prescription, we turn now to whether the instant claimant knew or had reasonable grounds to believe her disease was occupationally related.[5] We note that while there will certainly be factual situations presented where an employee has no reasonable grounds to believe he has an occupationally related disease absent a medical diagnosis of same, such is not the case herein. There is no doubt Ms. Bynum had actual knowledge of her condition insofar as she was diagnosed as early as 1984 with bronchiectasis. The question to be resolved is at what point she knew or had reasonable grounds to believe that condition was "occupationally related."
According to claimant's own testimony below, she began coughing up sputum "filled with ink" as early as 1984. She additionally testified that Dr. Dantzker and Dr. Glann at the Health Science Center in Houston told her in December of 1985 not to work in any environment containing smoke, dust or fumes. Claimant reported to Dr. Perret in November of 1987 that working around the ink fumes at Capitol City Press had aggravated her cough. Dr. Perret advised claimant at that time to avoid exposure to irritating or toxic chemicals or fumes which might aggravate her bronchiectasis. Dr. McClay's notes from August of 1988 and October of 1988 indicate Ms. Bynum told him "she had been totally well prior to onset of illness that led to a lobectomy in 1984"; "her problem *589 began after she took a job working on the newspaper and such had followed her coughing up ink"; inhaling the black ink fumes "would make her dizzy and weak"; and her problem of coughing up sputum has its "onset after working in press room." Dr. McClay testified that he "probably may have" told claimant in September of 1988 that his impression was that her bronchiectasis was actually occupational lung disease and that he did tell her the inhalation of the ink fumes at Capitol City Press "could be" the cause of her condition. Throughout her treatment with Dr. McClay in 1988, claimant complained about a continual problem with spitting up streaks of black ink. Finally, in her testimony below, claimant answered "yes" in response to a question from the hearing officer as to whether doctors prior to Dr. McClay had told her that her condition was "caused by the conditions of [her] work" at Capital City Press.[6]
Based on the foregoing, we find the lower courts were not manifestly erroneous in concluding claimant had reasonable grounds to believe her disease of bronchiectasis was related in some way to her occupation by the end of 1988 at the latest. As such, her claim filed several years later on February 11, 1991 is prescribed under the terms of La.R.S. 23:1031.1.E.

CONCLUSION
The court of appeal properly affirmed the hearing officer's granting of defendant's exception of prescription.
AFFIRMED.
WATSON, J., concurs in the result.
CALOGERO, C.J., and JOHNSON, J., dissent and assign reasons.
CALOGERO, Chief Justice, dissenting.
I do not subscribe to the view that expert testimony is always required in order for a plaintiff to become aware of grounds to believe that her occupational disease is occupationally related.
However, in this case, expert testimony was clearly required in order for the plaintiff to know that her condition was occupationally related. The majority recites the facts which show that there was clear doubt, on the part of plaintiff's physician, as to the cause of her condition, but still holds the plaintiff to the standard of knowing that she suffered from an "occupational disease" even when her doctor had serious doubt.
The majority plainly states that Dr. McClay testified that he was able to make a diagnosis of occupational disease "only after *590 he examined claimant's brothers to rule out any hereditary lung problems." Ante, 676 So.2d at 585 (emphasis added). Further, the letter in which Dr. McClay noted his "impression" that Bynum's condition was due to her occupation clearly states that additional tests (bronchogram, exercise diffusion study, nadionulide ventriculography, and pulmonary function studies) were needed in order to make a complete diagnosis. It would have been negligent for Dr. McClay to rely upon his "impression" in light of his doubts and the need for further testing.
Given the reasonable suspicion of the plaintiff's doctor that her condition was congenital and/or hereditary and under all of the facts evident in the record, it would take an expert diagnosis for this, or any other, plaintiff to believe that her condition was occupationally related. Therefore, I respectfully dissent.
JOHNSON, Justice, dissenting.
I respectfully dissent. The majority has chosen to follow the same flawed conclusions reached by the hearing officer for the Office of Workers' Compensation. Dr. Wilbert McClay's letter dated 16 September 88, indicated that it was his "impression" and not diagnosis, that claimant's disability was due to occupational disease. This information should not have lead the hearing officer to conclude that claimant's condition was related to her occupation because the letter further stated that additional testing needed to be done.
This court has abandoned Williams v. Public Grain Elevator of New Orleans, Inc., 417 So.2d 398 (La.App. 4th Cir.1982), writ not considered, 422 So.2d 160 (La.1982), where the court ruled that the diagnosis of occupational disease, requires expert testimony. The court opined "Needless to say, not all diseases suffered by working individuals are occupational diseases and the diagnosis of a disease as an occupational disease requires expert testimony."[1]
In a recent decision involving this same issue of prescription, the second circuit court of appeal decided to follow the rule of Williams, supra in the case of Perkins v. Asplundh Tree Expert Co., 650 So.2d 1198 (La.App. 2 Cir.1995). In Perkins the court stated that:
"Few outside the medical profession, however, are competent to say that recurring symptoms are symptoms of a particular disease, much less of an occupational disease within the meaning of w.c. law ... the occupational disease, not the symptoms of the disease and not the disability resulting from the disease, `"manifests'" itself when a medical doctor squarely diagnoses the worker as having an occupational disease within the w.c. law."[2]
Our jurisprudence is such that worker's compensation laws must be given liberal interpretation in favor of workers. See Harold v. La Belle Maison Apartments, 643 So.2d 752, 94-0889 (La.1994); Allen v. City of Shreveport, 637 So.2d 123, 93-2928 (La.1994); Campbell v. Fidelity & Casualty Co. of New York, 339 So.2d 339 (La.1976). We abandon the general rationale behind workers' compensation laws if we overrule Williams and Perkins.
Not many individuals outside the medical field are competent to detect an occupational disease within the meaning of Louisiana workers' compensation laws. While an intelligent person can "suspect" what his/her condition might be, it is unreasonable to hold in this case that the legislature would expect a person who lacks scientific expertise to "know" he has a disease, especially where a medical expert opined that further tests needed to be done before he could reach a conclusion. Accordingly, I must dissent.
NOTES
[*] Because of the vacancy created by the resignation of Dennis, J., now a judge on the United States Court of Appeals for the Fifth Circuit, there was no justice designated "not on panel" under Rule IV, Part II, § 3. Panel included Chief Justice Calogero and Justices Marcus, Watson, Lemmon, Kimball, Johnson, and Victory.
[1] 94-1658 (La.App. 1st Cir. 5/5/95), 655 So.2d 489.
[2] 95-1395 (La. 9/22/95), 660 So.2d 462.
[3] Ms. Bynum did not work again until she worked part time for the West Baton Rouge Parish School Board from December of 1988 through March of 1990. She worked 82.5 hours in 1988, 219.5 hours in 1989 and 382.5 hours in 1990.
[4] However, we make no comment on, nor does our overruling of the cases indicate, whether the facts as presented in those cases are such that a court would find the claimants in those cases knew or had reasonable grounds to believe they had a disease which was occupationally related.
[5] Plaintiff argues to this court that it was defendant's burden to prove Ms. Bynum's claim had prescribed (i.e. that it was defendant's burden to prove Ms. Bynum knew or had reasonable grounds to believe she had an occupationally related disease) and that the burden of proof did not shift to claimant because it was not clear on the face of the petition that the claim was prescribed. The hearing officer held defendant had proven the claim was prescribed on the face of the petition and therefore the burden of proving the claim was not prescribed (i.e. that Ms. Bynum did not know or have reasonable grounds to believe she had an occupationally related disease) shifted to the claimant. The court of appeal did not address this issue.

We need not address this issue for even assuming the burden of proof remained on the defendant and did not shift to the plaintiff, we find the record contains ample evidence, including, inter alia, documents introduced by claimant as well as testimony elicited by claimant's attorney on direct examination as well as by defendant's attorney on cross-examination, which more than suffice to meet defendant's burden of proof.
[6] Claimant seemed to argue in brief that she did not know or have reasonable grounds to believe her bronchiectasis was occupationally related until the actual diagnosis of such by Dr. McClay in October of 1990 because it was not until that point that Dr. McClay ruled out heredity as a cause of the disease. Certainly, if claimant reasonably believed her disease was caused by genetics of heredity, such a belief would be a factor for a court to consider in determining whether claimant had reasonable grounds to believe her disease was occupationally related. However, although Ms. Bynum informed Doctors Glann and Dantzker, and perhaps at some point Doctor McClay, that her siblings also had a "pulmonary disorder" similar to hers, this does not constitute evidence that claimant believed heredity was the cause of her bronchiectasis nor did she testify to such at trial. Furthermore, in December of 1985, Doctors Glann and Dantzker at the University of Texas Health Science Center in Houston, Texas wrote Dr. Lott that they had informed claimant "that although there does not appear to be any underlying congential [sic] or hereditary reason for her pulmonary problems, further studies to completely rule this possibility out would be necessary, specifically, with her siblings and possibly other family members." Finally, any argument that claimant believed her disease was hereditary and not occupational is directly contradicted by her statements to Dr. McClay on their first appointment on August 22, 1988 wherein she told him "her problem began after she took a job working." We also note that claimant, when asked at that visit about any family history of medical problems, only recounted to Dr. McClay the following information which he took down in his notes: "Mother has hx. diabetes/hypertensionFather/Sister ? emphysema secondary to heavy smoking."

We note that claimant in brief alleges Dr. Perret was of the impression that claimant's lung disease was hereditary, and refers to hearing testimony by Dr. McClay wherein Dr. McClay testified Dr. Perret had given some indication in his records that perhaps claimant's condition was hereditary. However, Dr. Perret himself did not testify at the hearing, and the only report by him introduced into evidence does not contain any indication at all that Dr. Perret believed claimant's condition was hereditary.
[1] Id. at 399.
[2] Perkins at 1200.