| JOAN BERNARD ARMSTRONG, Chief Judge.
This is a workers’ compensation case. On January 25, 2001, plaintiff-appellee, Lawrence Gastinell, filed a disputed claim for compensation against his employer, Transit Management of Southeast Louisiana; Inc. (TMSL) alleging TMSL wrongfully terminated his compensation benefits on December 3, 2000. Mr. Gastinell claimed that on August 16, 1985, he reported to Ronnie Normand, a utility worker, that a person came onto company property brandishing a gun. Mr. Gastinell and other employees ran, and after having run to safety, Mr. Gastinell suffered a heart attack.
The parties attended a mediation conference on April 17, 2001 at which the issues were framed but were not resolved. On May 3, 2001, TMSL answered, denying Mr. Gastinell was temporarily or permanently disabled or sustained an injury resulting in a loss of earning capacity. By supplemental answer, TMSL claimed the benefit of social security offset for disability and old-age insurance benefits, benefits under employer-funded disability plans, unemployment compensation and receipt of any other workers’ compensation benefits under LSA-R.S. 23:1225. TMSL also claimed the benefit of reduction of benefits for voluntary payments of unearned wages under LSA-R.S. 23:1206, medical expense/insurance offset under LSA-R.S. 23:1212 and denied it acted in an arbitrary and capricious manner at any time. TMSL also asserted a credit for Mr. Gasti-nell’s post-accident earnings or wage earning capacities under LSA-R.S. 23:1221(3) and credits or deductions for the payment of weekly compensation benefits pursuant to LSA-R.S. 23:1223.[1]
Mr. Gastinell’s case was heard on October 25, 2002. The parties stipulated to Dr. Keith Ferdinand’s medical records and his deposition that had been taken for trial purposes. The parties also stipulated that TMSL paid $182.94 each week from August 16, 1985 through December 3, 2000. The parties stipulated to Mr. Gastinell’s accident, but not that his present physical condition and medical problems are related thereto. The workers’ compensation court admitted all exhibits for trial purposes.
Following trial, the workers’ compensation judge entered judgment on November 18, 2002, finding Mr. Gastinell to be permanently and totally disabled, ordering reinstatement of his weekly benefits in the amount of $182.94 retroactive to December 3, 2000 and continuing, and awarding him attorney’s fees in the amount of $7,500 pursuant to LSA-R.S. 23:1201.2. From *257 that judgment, TMSL appeals. Because we do not find the judgment of the workers’ compensation court to be manifestly, erroneous or clearly wrong, we affirm.
The record reflects that Mr. Gastinell, a sixty-eight year old man with a high school education testified that he had been a deputy sheriff for thirteen years. Subsequently, he worked for seven months for TMSL in maintenance, cleaning busses and .changing lights. He worked an average of fifty hours per week. On August 16, 1985, while he was at work, a man carrying a gun came into the area where Mr. Gastinell was working.. People were running, saying, “Run, he got a gun.” Mr. Gastinell .ran for about two blocks and collapsed. He was taken to St. Charles General Hospital, where he underwent an angioplasty incident to a heart attack. Two days later, his leg grew cold, and ultimately in 1986 he had a leg bypass operation. Mr. Gastinell did not return to work after the incident.
On November 25, 1985, Dr. Johnny L. Gibson saw Mrs. Gastinell at Pendleton Memorial Methodist Hospital. Dr. Gibson noted that his right foot was cool; there was a decreased pulse on the left and no pulse felt below the popliteal on the right side. His impression was peripheral vascular disease and anginal cardiovascular disease.
On July 22, 1986, Dr. Nathaniel Ross signed an attending'physician’s statement indicating that he had seen Mr. Gastinell once or twice a month since September 1985, and certified that Mr. Gastinell remained totally disabled because of angina pectoris due to his previous myocardial infarction and intermittent chest pain and peripheral vascular disease. Dr. Ross by letter dated August 11, 1988 confirmed this opinion and diagnosis.
Dr. Sheldon Hersh saw- Mr. Gastinell on June 10,1988, and noted his heart problem originating with the 1985 incident at work; right leg weakness and soreness that began one month after the coronary angioplasty in August 1985 and for which he had bypass surgery of the right leg at Methodist Hospital; continued heavy chest pain brought on with exertion and quickly relieved by nitroglycerine; peripheral vascular disease with no intermittent claudication; mild numbness over the right anteri- or lower leg and a mild limp; and mild elevation of blood pressure.
On August 22, 1990, Mr. Gastinell saw Dr. Keith C. Ferdinand who diagnosed him as having stress headaches. Dr, Ferdinand saw Mr. Gastinell again on September 11, 1991 and reported that Mr. Gasti-nell had a long history of hypertension and atherosclerotic heart disease. His overall cardiac status was under control. Dr. Ferdinand cleared him for needed surgery with general anesthesia and continued him on his medication. A March 8, 1991 chart n’ote shows that Mr. Gastinell complained of severe headaches, hypertension and extreme stress. Dr. Ferdinand diagnosed possible muscle spasm and anxiety. On April 29, 1992, Dr. Ferdinand prescribed a nicotine patch in response to Mr. Gasti-nell’s request to help him' discontinue smoking. Dr. Ferdinand noted Mr. Gasti-nell’s blood pressure was somewhat elevated and his electrocardiogram showed nonspecific changes. On May 13, 1992, his blood pressure was elevated and Dr. Ferdinand increased his medication. On October 2, 1992, Dr. Ferdinand noted Mr. Gastinell’s status was excellent, prescribed Valium for anxiety caused by his mother’s illness,- and continued him on Mevacor. Dr. .Ferdinand made -similar notes on March 30, 1993. On July 23, 1993, Dr. Ferdinand noted that Mr. Gastinell had been operated on recently for a repeat hernia, and had anxiety due to the recent death -of an aunt and his mother’s illness. *258 He also noted trace edema in Mr. Gasti-nell’s feet, no pulses and warm feet. On January 28, 1994, Dr. Ferdinand noted Mr. Gastinell’s elevated blood pressure, poorly controlled hypertension and grief over his mother’s death. These findings continued through August 1994. In 1995, Dr. Ferdinand noted acute bronchitis and uncontrolled blood pressure. On January 9, 1995, Dr. Ferdinand noted that Mr. Gasti-nell was anxious because he had to care for his brother, who had just undergone triple bypass surgery at the age of 69.
On April 14, 1995, Dr. James R. Lucas saw Mr. Gastinell and noted he had no chest pain or shortness of breath and continued his medications. On October 17, 1995, Mr. Gastinell complained of an October 13 episode of chest pain relieved by nitroglycerin.
Dr. Ferdinand saw Mr. Gastinell on July 24, 1995 and noted, “Patient remains totally disabled from previous vascular disease.” He noted Mr. Gastinell has had multiple episodes of atypical chest pain with exercise. Dr. Ferdinand’s assessment was possible progressive coronary disease. In November 1996, Dr. Ferdinand noted Mr. Gastinell had periods of chest discomfort and sweating from 2:00 to 3:00 in the morning. The assessment at that time was possible new onset angina with variant angina and need for better control of blood pressure.
On January 17, 1997, Dr. George A. Miller saw Mr. Gastinell for shortness of breath and nervousness. Problem noted were recurrent angina pectoris, hypertension and hyperlipidemia. In June 1997, Dr. Ferdinand noted that Mr. Gastinell no longer smoked, but had decreased foot pulses. He recommended that Mr. Gastinell continue his medication, cut grass and walk three miles as tolerated. Mr. Gasti-nell continued to do well as reported by notes from June and September 1997 and February 1998. Mr. Gastinell was hospitalized for treatment of an infection and swelling of his right knee in early 1999. In February 2000, Dr. Ferdinand evaluated Mr. Gastinell and found he had “guarded cardiac status” and “severe peripheral arterial disease.” He prescribed Procar-dia, Zocor, Valium and multivitamins.
On May 28, 1999, LSU Cardiologist Dr. Thomas D. Giles examined Mr. Gastinell, and opined that the incident that occurred on August 16, 1985 was not clearly associated with angina pectoris. He referred Mr. Gastinell’s risk factors in 1985 to male sex, age greater than 40 and elevated cholesterol. Furthermore, he smoked from the age of 27 and has had exposure to asbestos. Dr. Giles concluded that Mr. Gastinell was not a “reliable historian”. He found no evidence of congestive heart failure and no history of angina pectoris or evidence of generalized atherosclerosis. He felt that Mr. Gastinell suffers from a psychiatric condition and symptoms such as hallucinatory behavior and persecution suggest schizophrenia. He concluded that Mr. Gastinell would be capable of performing a full range of sedentary or light work compatible with his age, and is not permanently or temporarily disabled. Given his long history of disability, rehabilitation may not be possible. Dr. Giles related the chain of events that led to the arterial obstruction of the right leg to the coronary procedures performed as a result of the hostile encounter, but did not express an opinion as to the propriety of the procedures.
Mr. Gastinell testified that since August 16, 1985, TMSL did not provide any rehabilitation services or send him on any job interviews. TMSL did nothing to get Mr. Gastinell to return to work. He testified that he has not received compensation benefits since December 3, 2000 and has not worked any job since August 16, 1985.
*259 At the time of trial, Mr. Gastinell took blood pressure medicine, cholesterol medicine, Valium, blood thinner, iron supplement and nitroglycerine for chest pains. He testified that at no time has any physician told him he could return to work.
Prior to August 16, 1985, Mr. Gastinell lived an active life, playing baseball and basketball, jogging, and going to sporting activities. Now he tries to cut the grass at his home and wash the pavement around the house, but sometimes gets short of breath and needs to use an inhaler. He now has to pay someone to perform maintenance at his home. He sometimes takes a five minute walk to the drugstore or grocery store. He visits an off-track betting parlor once or twice a month.
In 1986, he applied for Social Security disability benefits, and receives about $600 each month. When he reached the age of 62, the disability benefits were transferred to old age benefits. He received monthly disability payments from Travelers Insurance for three years for a total payout of $15,000. He testified that workers’ compensation pays for his blood pressure and cholesterol medication and nitroglycerine and Valium. His “old age insurance” pays for the remaining medicines.
On cross-examination, Mr. Gastinell was shown his deposition in which he admitted that prior to 1985 he was in an automobile accident and claimed he was injured when in fact he was not. He testified at the deposition that he received medical treatment for non-existent injuries and that he took that action because the insurance company refused to pay for his property damage. At trial, he testified he could not recall the incident. He denied that any of his siblings had had bypass operations, although Dr. Ferdinand’s notes show that a brother had such an operation.
Mr. Gastinell testified that he could sit for about an hour and stand for perhaps an hour and a half. He could cut his grass for five minutes at a time. He pays his nephews to do yard work and maintenance at his house. He testified that he does not work because of his chest pains and because his legs give way. His most recent incident of chest pain was about a week before the trial. He testified that Dr. Gibson told him his leg gives out as a result of his surgery. His most recent incident of this leg problem was about two weeks before the trial. He noted other health problems including a hernia, prostate cancer and obstruction of his breathing.
Terrell Miceli, a licensed private investigator, testified for TMSL. At the request of the Regional Transit Authority (RTA), he conducted surveillance of Mr. Gastinell on January 31 and February 3, 1998, and produced videotape of his activities on February 3. The videotape consists of four segments for a total of eight minutes, showing Mr. Gastinell going into a grocery store, going into a post office, getting out of his car and going into a drug store, and returning to his car. On February 9, 1998 Mr. Miceli took a five minute tape showing Mr. Gastinell checking his oil and wiping his car for five minutes. There was a forty-five minute segment showing Mr. Gastinell at an off-track betting parlor. Mr. Miceli testified that he observed a great deal of activity that he was unable to record.
TMSL called another licensed private investigator, Brian O’Connor, who testified that the RTA hired him to perform surveillance of Mr. Gastinell on November 13, 2001. He conducted the surveillance and investigation on November 19, 2001. Mr. O’Connor was not sure he could identify Mr. Gastinell on that day, and observed his home on December 14, 2001, when Mr. Gastinell did not leave his house. On January 2, 2002, Mr. O’Connor arrived at Mr.
*260 Gastinell’s home at 7:06 a.m. Mr. Gastinell left the house at 8:47 p.m., entered his car and drove to Oakwood Mall. He smoked a cigarette in his car, spoke with an unidentified woman for a few minutes and left at 4:00. Mr. O’Connor followed Mr. Gastinell to and into an off-track betting establishment at about 4:26. Mr. Gastinell was inside the establishment for about an hour and forty-five minutes, whereupon he returned to his car. Mr. Gastinell was shown on videotape observing overhead monitors showing various races and conversing with an unidentified person.
TMSL called Ms. Christine Wellborn, a vocational .case manager for COR-VEL Corporation, to testify. When Ms. Well-born admitted that she is not licensed as a vocational rehabilitation counselor in Louisiana and has worked for COR-VEL for only two months, had no personal familiarity with Mr. Gastinell’s record at COR-VEL and did not handle his rehabilitation evaluation, the workers’ compensation court asked if she had a job analysis for the applicable time frame. Ms. Wellborn noted that she did not. Her activity consisted of going online to search through the local employment service for potential jobs that appeared to be realistic based on information in the file from the former COR-VEL employee who handled Mr. Gastinell’s rehabilitaion evaluation. She testified:
Now, can I guarantee that they’re all sedentary jobs? No, I have not done a thorough analysis of them. This is just a screening. If I was doing that, this might be something I might do as my first starting point, and then I would then try to contact the employers and do the restuf the work.
The workers’ compensation judge noted that there was no guarantee that Mr. Gast-inell’s treating physician would release him to any of those jobs. Counsel for TMSL then told the court he had no questions for the witness.
 It is a well-settled principle that the provisions of the worker’s compensation scheme should be liberally interpreted in favor of the worker. Bynum v. Capital City Press, Inc., 95-1395, pp. 5-6 (La.7/2/96), 676 So.2d 582, 586.
The standard of review for findings of fact by a hearing officer in a worker’s compensation case is “manifest error,” and it is the appellate court’s duty to determine not whether the fact finder’s conclusion was right or wrong, but whether it was reasonable. Where there are two permissible views of the evidence, a fact finder’s choice between them can never be manifestly erroneous. Seal v. Gaylord Container Corp., 97-0688, pp. 4-5 (La. 12/2/97); 704 So.2d 1161, 1164.
In TMSL’s first assignment of error, TMSL contends that the Workers’ Compensation Court erred in finding that appellee proved by clear and convincing evidence that Mr.,Gastinell is permanently and totally disabled.
The causal link between the employee’s illness and work-related duties must be established by, a reasonable probability. Once the employee has established the existence of an occupational disease, for his illness to be compensable, the employee must further establish that the illness is disabling, that is that he meets the criteria for one or more of the statutory disabilities, that is (1) temporary total disability, (2) permanent total disability, (3) supplemental earnings benefits, or (4) permanent partial disability. La.R.S. 23:1031.1(A) and (B); La.R.S. 23:1221; Seal v. Gaylord Container Corp., at p. 6; 704 So.2d at 1165.
Compensation for permanent total disability shall be awarded only if the em *261 ployee proves by clear and convincing evidence, unaided by any presumption of disability, that he is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in pain, notwithstanding the location or availability of any such employment of self-employment. LSA-R.S. 23:1221(2)(c).
The workers’ compensation judge in her reasons for judgment noted that Mr. Gast-inell admitted that his activities consist of occasionally cutting his grass[2], attending off-track betting parlors and watching television. The reasons for judgment note Mr. Gastinell’s deposition testimony in which he testified that he pretended to be injured in a prior car accident so that he could get the other driver to pay for the repairs to his car. Furthermore, the reasons note that although Mr. Gastinell denied that his brother had heart problems, Dr. Ferdinand’s record dated January 9, 1995 notes, “Patient notes being very anxious. His brother recently had triple bypass at 69 years of age, for whom he must care...
The reasons for judgment note the videotape evidence and Ms. Wellborn’s disqualification, the medical records from St. Charles General Hospital, Ochsner Clinic and TMSL’s physician, Dr. Giles. The reasons refer to Dr. Ferdinand’s deposition, in which he testified that he saw Mr. Gastinell regularly from 1990 until January 5, 2001. When asked about his letter of September 12, 2002 in which he said, “Patient is permanently disabled and unable to perform activities related to regular job duties,” Dr. Ferdinand testified that this conclusion reflected his objective opinion based on his overall assessment of Mr. Gastinell, along with what he told the doctor about his general condition. When asked by COR-VEL to review possible jobs in early 2000, he opined that Mr. Gastinell could perform the job of receptionist at Lamarque Dodge and Americare Chiropractor, but could not perform five other sedentary jobs including human resources assistant, dispatcher, sreceptionist, telephone orator and telemarketer. Dr. Ferdinand also opined that where a heart patient complains of severe headaches, cramping, leg pain .and says he is unable to work, the doctor will not push the patient “to do something, because heart patients die suddenly.”
The workers’ compensation judge apparently rejected Dr. Giles’ opinion that Mr. Gastinell was not permanently or totally disabled from working, since he stated he could “elicit no history of angina pectoris nor find evidence of generalized atherosclerosis”, both of which were conditions noted by Dr. Ferdinand over the course of many years treating Mr. Gastinell and by Dr. Gibson, Dr. Ross, Dr. Hersh, Dr. Lucas and Dr. Miller.
The judge then applied the provisions of LA-R.S. 23:1221(2)(a) and (c) to the found facts and held that Mr. Gastinell met his burden of proving his total, permanent disability. He has been out of the workforce for over seventeen years and even TMSL’s own Dr. Giles admits he is not a good candidate for vocational rehabilitation.
Significantly, the workers’ compensation judge noted:
Finally, the court had the chance to observe Mr. Gastinell’s demeanor during his trial testimony and found him to be a credible witness.
*262 This credibility choice was made by the court while recognizing the negative influences of his deposition testimony concerning his prior auto accident and his lack of candor during questioning concerning his brother’s triple by-pass. This is clearly one of those cases in which the workers’ compensation court was in a unique position to observe the witness’ testimony and demeanor, while we as a reviewing court have access only to a cold record. When, as here, there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the workers’ compensation court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the workers’ compensation court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access' only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
The videotapes on which TMSL relies show in large measure only extremely brief snippets' of very moderate activity by Mr. Gastinell. Nothing in the videotapes indicates that Mr. Gastinell would be able to work a full day, much less fulfill the duties of regular employment. The mere fact that Mr. Gastinell could watch television monitors at the off-track betting parlor for less than two hours does not rebut his and his doctor’s clear and convincing evidence of total, permanent disability.
Applying the appropriate standard of review to the workers’ compensation court’s judgment, we find the judgment on liability is not manifestly erroneous or clearly wrong. This assignment of error is without merit.
In TSML’s second assignment of error, TSML contends that the Workers’ Compensation Court erred in finding that TMSL acted unreasonably in terminating workers’ compensation indemnity benefits, and thus awarding $7,500 in attorney’s fees pursuant to LSA-R.S. 23:1201.2.
Any employer who at any time discontinues payment of a claim due and arising under Chapter 10 (Workers’ Compensation) of Title 23 of the Louisiana Revised Statutes, when the discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney fees for the prosecution and collection of the claim. See, LSA-R.S. 23:1201.2.
TMSL argues that it reasonably relied on Dr. Giles’ opinion that Mr. Gastinell was fit to work and, from a medical standpoint, was not totally and permanently disabled. However, as noted by the workers’ compensation judge, Dr. Giles’ opinion is immediately suspect, since he finds no evidence of generalized atherosclerosis and no history of angina pectoris despite the fact that both those diagnoses are evident throughout Mr. Gastinell’s medical record. Either Dr. Giles did not read the record or he chose to ignore these serious infirmities. In either ease, his opinion is not sufficiently worthy of belief to justify TMSL’s reliance in terminating Mr. Gasti-nell’s benefits.
TMSL’s reliance on the videotapes is likewise misplaced. As noted in our discussion of the previous assignment of error, none of the selections demonstrate Mr. Gastinell’s ability to perform even a sedentary job.
*263 TMSL claims that it relied on Dr. Ferdinand’s conclusion that Mr. Gastinell could perform sedentary work; however, Dr. Ferdinand opined ion July 24, 1995 that Mr. Gastinell remained totally disabled. The doctor’s later opinion that Mr. could perform sedentary work was amended in May 2000, when he said Mr. Gastinell could not perform the jobs located by COR-VEL. Following that determination of disability, TMSL nonetheless terminated Mr. Gastinell’s benefits just over six months later.
TMSL does not question the reasonableness of the amount of attorney’s fees awarded by the workers’ compensation court. We find $7,500 to be a reasonable fee under the circumstances of this case.
We do not find the workers’ compensation court’s decision that TMSL acted unreasonably in terminating Mr. Gastinell’s benefits was manifestly erroneous or clearly wrong. This assignment of error is without merit.
For the foregoing reasons, we find the judgment below is not manifestly erroneous or clearly wrong. Therefore, we affirm the judgment of the workers’ compensation court finding that Lawrence Gastinell is permanently and totally disabled; awarding Mr. Gastinell reinstatement of his weekly benefits in the amount of $182.94, retroactive to December 3, 2002 and continuing; and awarding Mr. Gastinell attorney’s fees in the amount of $7,500.
AFFIRMED.

. TMSL had not assigned as error the absence of these offsets in the judgment of the worlc-ers’ compensation court.

. The record shows he also occasionally washes down the pavement at his home.