805 So.2d 215 (2001)
Kenneth HAYNES
v.
WILLIAMS FENCE AND ALUMINUM.
No. 01-0026.
Court of Appeal of Louisiana, Third Circuit.
July 25, 2001.
Rehearing Denied January 10, 2002.
*217 George A. Flournoy, Flournoy, Doggett & Losavio, Alexandria, LA, Counsel for Plaintiff/Appellant Kenneth Haynes.
Bradley J. Gadel, Percy, Smith, Foote & Gadel, Alexandria, LA, Counsel for Defendant/Appellee Williams Fence and Aluminum.
Court composed of HENRY L. YELVERTON, JOHN D. SAUNDERS, and JIMMIE C. PETERS, Judges.
JIMMIE C. PETERS, J.
Kenneth Haynes suffered an injury to his left wrist while in the course of his employment with Williams Fence and Aluminum. He filed a claim for workers' compensation benefits, penalties, and attorney fees. The workers' compensation judge granted Haynes only part of the relief he requested, and he now appeals.

DISCUSSION OF THE RECORD
Williams Fence and Aluminum (WFA) is a sole proprietorship in the business of constructing and installing chain link fences, canopies, patio covers, and vinyl siding. Shannon Williams, the owner of WFA, hired Haynes as a "helper" on September 1, 1998, on a full-time basis. On January 19, 1999, Haynes fell from a ladder during the course of his employment and injured his left wrist. Haynes testified that the accident dislocated his hand such that it "was up on [his] forearm."
Haynes sought treatment at Christus St. Frances Cabrini Hospital (Cabrini Hospital) in Alexandria, Louisiana, following the accident. The hospital records describe the following: "Examination of the wrist shows him to have an extremely deformed wrist with the hand and carpus dislocated dorsally on top of the wrist.... Radiographs show a complex distal radius fracture with dislocation of the carpus from the distal radial-ulnar-carpal joint." On January 22, 1999, Dr. John Fritchie, an Alexandria orthopedic surgeon, performed a closed reduction with percutaneous pin fixation.
Louisiana United Businesses Association Self-Insurers Fund (LUBA), the workers' compensation provider for WFA, instituted temporary total disability benefits beginning January 27, 1999, in the amount of $194.00 per week based on an average weekly wage of $291.00. However, despite Haynes's full-time employment status, this average weekly wage calculation did not reflect earnings based on a forty-hour work week.
Haynes continued to have pain, popping, and clicking in his wrist, and Dr. Fritchie referred him to Dr. Mark Dodson, another Alexandria orthopedic surgeon. After examining Haynes on May 17, 1999, Dr. Dodson concluded that Haynes suffered from an impingement of the ulna (or a butting of the ulna against the carpus), instability between the ulna and radius, and ulnar nerve pain. Dr. Dodson recommended an arthrogram to detect any ligament tears and a Suave-Kapandji procedure in which a section of the ulna is removed and the end of the ulna is fused to the radius. An arthrogram performed on June 9, 1999, revealed no evidence of a ligament tear.
In the meantime, by letter dated May 20, 1999, LUBA advised Haynes that it had scheduled an appointment with Dr. Michael C. Genoff, another Alexandria orthopedic surgeon, to obtain a second opinion. Dr. Genoff, who has a subspecialty in hand surgery, saw Haynes on June 1, 1999, and again on June 22, 1999, for reassessment of his condition. He agreed with Dr. Dodson's recommendation of the Suave-Kapandji procedure but additionally recommended an arthroscopy to visualize the wrist ligaments. He made this recommendation *218 based on the fact that twenty percent of arthrograms produce false negative results. As we appreciate Dr. Genoff's testimony, the arthroscopy would allow the doctor to detect any tears missed in the arthrogram so that they could be repaired during the Suave-Kapandji procedure.
Because Haynes "felt ... more confident" with Dr. Genoff, he requested authorization from LUBA for Dr. Genoff to perform the surgery. Although LUBA was willing to approve the surgery with Dr. Dodson and although LUBA had sent Haynes to Dr. Genoff in the first place, it rejected Haynes's request that Dr. Genoff perform the surgery. In fact, LUBA's claims adjuster threatened to reclassify Haynes's benefits if he did not allow Dr. Dodson to perform the surgery. She recorded this decision in a note dated July 13, 1999, wherein she stated that she "declined and told [Haynes] that Dr. Dodson was qualified to do the procedure. [She] also informed him that if he decided not to go through with the surgery on 7/14/99, [she] would immediately reclassify his benefits SEB/Mo. This is because he's currently released to light duty."
On July 14, 1999, LUBA did in fact convert Haynes's temporary total disability benefits to supplemental earnings benefits and continued its reclassification of Haynes's status through June 11, 2000. However, LUBA did not pay supplemental earnings benefits during this period on the basis that it did not receive the appropriate form setting forth Haynes's monthly report of earnings after it reclassified him.
Despite LUBA's refusal to authorize Dr. Genoff to perform the approved surgery, Haynes returned to Dr. Genoff on February 1, 2000, with complaints of wrist pain and stiffness as well as numbness and tingling in his small finger. The choice-of-physician and surgery-authorization issues were resolved in favor of Haynes in a February 15, 2000 decision. Although the record does not contain the February 15 order, the parties stipulated that on that date the workers' compensation judge authorized the procedures recommended by Dr. Genoff and ruled that Dr. Genoff would be considered Haynes's choice of physician. This order itself was reduced to writing on April 20, 2000.
Despite the workers' compensation judge's February 15 order, LUBA still did not authorize the arthroscopy with Dr. Genoff until May 1, 2000. Dr. Genoff performed the arthroscopy on June 12, 2000, which revealed frayed, but not torn, ligaments. During the procedure, Dr. Genoff performed a synovectomy of the wrist joint and debrided the fraying. LUBA reinstituted temporary total disability benefits for a week based on Dr. Genoff's deposition testimony that the recovery period after the procedure would probably be a week. However, in a subsequent deposition, Dr. Genoff testified that the recovery time would be about six weeks. The doctor's plan was to perform either the Suave-Kapandji procedure or an ulnar shortening osteotomy after determining how Haynes responded to the arthroscopy. Thereafter, LUBA reinstituted temporary total disability benefits retroactive to the discontinuance.
The trial on the merits occurred on July 20, 2000. At that time, Haynes had yet to undergo the additional surgery with Dr. Genoff. Among the issues before the workers' compensation judge were the extent and duration of disability, calculation of indemnity benefits, nonpayment or untimely payment of medical benefits, vocational rehabilitation, and penalties and attorney fees. The workers' compensation judge concluded that Haynes's average weekly wage had been properly calculated, ordered payment of two bills for medical *219 services provided on the date of the accident by Cabrini Hospital, awarded penalties of $2,000.00 and attorney fees of $2,500.00 for the failure to timely pay these two medical bills, held that WFA was not arbitrary and capricious in contesting Haynes's requested change to Dr. Genoff as his treating physician, held that Haynes was not doctor shopping when he requested Dr. Genoff as his treating physician, held that Haynes was not entitled to temporary total disability benefits from July 14, 1999 through June 11, 2000, held that WFA had not terminated supplemental earnings benefits but had only suspended them because of Haynes's and/or his attorney's refusal or failure to supply the information required by La.R.S. 23:1221(3)(f) to calculate the benefits, and ordered that the parties bear their own costs.[1] Haynes has appealed.

OPINION

Calculation of Average Weekly Wage
Louisiana Revised Statute 23:1021 provides in part:
(10) "Wages" means average weekly wage at the time of the accident. The average weekly wage shall be determined as follows:
(a) Hourly wages.
(i) If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater; or
(ii) If the employee is paid on an hourly basis and the employee was offered employment for forty hours or more but regularly, and at his own discretion, works less than forty hours per week for whatever reason, then, the average of his total earnings per week for the four full weeks preceding the date of the accident....
The parties do not dispute that Haynes was hired as a full-time employee at a pay rate of $8.00 per hour. As a full-time employee and assuming that he worked no overtime, under La.R.S. 23:1021(10)(a)(i), Haynes's average weekly wage would be $320.00 (40 hours × $8.00/hour). However, LUBA calculated Haynes's average weekly wage to be $291.00 under the more restrictive La.R.S. 23:1021(10)(a)(ii). LUBA apparently based this more restrictive calculation on its conclusion that Haynes regularly and at his own discretion worked less than forty hours a week. The workers' compensation judge found no error in LUBA's calculation, holding that Haynes was "an hourly-paid, full-time employee who regularly, at his own discretion, worked less than forty hours per week, and whose Average Weekly Wage (AWW) was properly calculated by the Employer as the average of his total earnings per week for the four full weeks preceding the date of the accident." Haynes *220 contests this finding, and we agree that the workers' compensation judge erred in reaching this conclusion.
While the payroll records establish that Haynes worked forty or more hours a week for only six of the twenty weeks of his employment, Williams, the owner of WFA, testified that during some of the incomplete weeks, the crew had been "rained out" or "between projects." Additionally, two weeks (one in September and one in December) represent weeks in which Haynes was on vacation. The evidence also reflects that Haynes, who had rheumatoid arthritis, missed work nine times during these twenty weeks for doctor appointments. However, during one of those weeks, he still worked over forty hours despite his medical appointment.
It is well settled that provisions of the workers' compensation scheme should be interpreted liberally in favor of the employee. Bynum v. Capital City Press, Inc., 95-1395 (La.7/2/96); 676 So.2d 582. As set forth above, the calculation in La. R.S. 23:1021(10)(a)(ii) is to be used only if the employee "regularly, and at his own discretion, works less than forty hours per week for whatever reason." In 1 H. Alston Johnson, III, Workers' Compensation Law and Practice § 322, in 14 Louisiana Civil Law Treatise (3d ed.1994), the author states:
It is unclear what the word "regularly" may mean in this context. If, in the critical four weeks preceding injury the employee took a few hours off for sick leave or annual leave, this should not be considered "regularly" working fewer than forty hours. He should be entitled to calculation on the basis of his ordinary forty-hour work week. On the other hand, if he takes a job which is nominally a forty-hour-a-week job but consistently conducts himself so that he works only 35 hours in a week, then perhaps his wages should be calculated under this provision. He should not be able to convert a full-time job (for which the employer is paying premiums on that basis) to a part-time job with full protection of wage earning capacity, at least without the employer's consent. The employer may well want a genuine full-time employee in that position as long as he has to pay for full-time employee protection. But of course this is a matter which the employer can control for himself. If he wants a full-time employee and has one in the position who "regularly and at his own discretion" works fewer hours, that employee can be terminated. The legislation on that point seems largely unnecessary.
Obviously, during the down times for rain and project changes, Haynes was not "offered employment" which he rejected at his "own discretion." Additionally, courts have concluded that it is error to include a vacation week as one of the four full weeks worked. See Transportation Ins. Co. v. Pool, 30,250 to 30,253 (La.App. 2 Cir. 5/13/98); 714 So.2d 153, writs denied, 98-1566, 98-1616 (La.9/25/98); 725 So.2d 486, 488; Doucet v. Crowley Mfg., 96-1638 (La. App. 3 Cir. 4/30/97); 693 So.2d 328, vacated on other grounds, 97-1438 (La.9/19/97); 701 So.2d 143.
Moreover, in most of the weeks in which Haynes had doctor appointments, the evidence fails to show that he would have been offered a forty-hour work week even if he had not taken off for the appointment. Rather, the evidence shows that even if Haynes had been offered an eight-hour work day on most of the days he missed for doctor appointments, he could not have worked enough hours to total a forty-hour work week, which would have been at the discretion of WFA. In fact, Haynes introduced into evidence records of his other full-time coworker's work *221 hours for the month of December, apparently the first month in which the two worked together, and these records disclose that the coworker did not work a forty-hour week in that month. Further, Williams accommodated Haynes's doctor appointments and testified that he hired Haynes with the knowledge that he had rheumatoid arthritis.
In East-Garrett v. Greyhound Bus Lines, 99-421 (La.App. 3 Cir. 11/3/99); 746 So.2d 715, we held that even though the employee did not take certain job opportunities offered to her due to illness in her family, the record did not show that she regularly and at her own discretion worked less than forty hours per week. With greater force we hold that necessary doctor appointments which the employer accommodates for a full-time employee are not the type of discretionary leave that in and of itself relegates an employee to the lesser calculation of his average weekly wage; rather, such appointments are in fact mandated by the employee's physical condition, the treatment of which may be the factor that allows him to continue in his employment. Further, the timing of such appointments is in part dependent upon the doctor's work schedule, which may not accommodate appointments on weekends or days that are otherwise not regular work days for the employee.
Thus, the workers' compensation judge erred in relegating Haynes to the calculation of his average weekly wage under La.R.S. 23:1021(10)(a)(ii) based on his finding that Haynes regularly and at his own discretion worked less than forty hours per week. Instead, Haynes is entitled to have his average weekly wage calculated under La.R.S. 23:1021(10)(a)(i).
In any event, we note that, even if the average weekly wage were properly calculated under La.R.S. 23:1021(10)(a)(ii), under the facts of this case it would yield the same result as a calculation under La.R.S. 23:1021(10)(a)(i) since Haynes actually worked over forty hours per week in the four full weeks prior to the accident. Specifically, the four full weeks prior to the accident were as follows: the week ending Saturday, December 5, 1998, in which Haynes worked fifty hours for wages totaling $440.00 [(40 × $8.00/hour) + (10 hours × $12.00/hour) ]; the week ending Friday, November 27, 1998, in which Haynes worked forty hours for wages totaling $320.00 (40 × $8.00/hour); the week ending Friday, November 20, 1998, in which Haynes worked forty hours for wages totaling $320.00; and the week ending Friday, October 30, 1998, in which Haynes worked forty hours for wages totaling $320.00. The average weekly wage, therefore, should be $350.00 [($440.00 + $320.00 + $320.00 + $320.00) / 4 weeks].
The manner in which LUBA calculated the average weekly wage is unclear. Plaintiff's Exhibit 48 reflects LUBA's calculation under La.R.S 23:1021(10)(a)(ii) as follows: ($256.00 + $320.00 + $320.00 + $268.00 = $1,164.00) / 4 = $291.00. The four weekly wage totals corresponding to the amounts used by LUBA occur in the weeks ending Friday, January 15, 1999 ($268.00); Friday, November 27, 1998 ($320.00); Friday, November 20, 1998 ($320.00); and Friday, October 2, 1998 ($256.00). Assuming these to be the weeks used by LUBA, it appears that LUBA included the earnings for only two of the four full weeks prior to the accident (the weeks ending November 20, 1998, and November 27, 1998) and improperly included earnings for two partial weeks preceding the accident (apparently the weeks ending January 15, 1999, and October 2, 1998). The week ending January 15, 1999, should have been rejected because, although it was the week immediately preceding the accident, Haynes was not offered *222 employment for forty or more hours that week. Williams testified that the limited hours that week were probably due to the crew being between jobs. Although it apparently incorrectly used that week, LUBA correctly did not include certain other weeks in December of 1998 and any other weeks in January of 1999 since those were not full weeks due to doctor appointments, holidays, rain, project changes, and/or vacation. It appears that LUBA also used the sixteenth week prior to the accident, i.e., the week ending October 2, 1998, in its calculation, although we arrive at this conclusion only because it is the only work week that supports LUBA's calculation. If LUBA did so, inexplicably it skipped two forty-hour work weeks in October of 1998. Furthermore, although Haynes worked all five days of the week ending October 2, it appears that he simply was not offered sufficient hours to total a forty-hour work week. Thus, it was not a full work week and should not have been considered as one of the four weeks.
While the weeks listed above correspond to the weekly wages used in LUBA's calculations, written notations on LUBA's Exhibits 1 and 2 suggest that it actually used the weeks ending Friday, January 15, 1999, Friday, January 8, 1999, Thursday, December 31, 1998, and Thursday, December 17, 1998, in making the average weekly wage calculation. The following represents the actual payroll record notations and the penciled in notations:

 Hours Actual Penciled in
Week Ending Worked Payment Notation
1-15-99 33.5 $286.00 $286.00
1-8-99 33.0 $264.00 $320.00
12-31-98 25.5 $204.00 $320.00
12-17-98 5.0 $ 40.00 $256.00

We have previously stated why the week ending January 15, 1999, should not have been used. The week ending January 8, 1999, contains a medical appointment day. December 31, 1998, was actually a Thursday, and the employer simply ignored the Friday holiday (New Years Day). In fact, the payroll records reflect that Haynes did not work at all December 31. Finally, it is totally unclear why the $256.00 notation appears next to the week ending December 17, 1998, a week in which Haynes worked only five hours.
Considering the four full weeks immediately prior to the accident as required by La.R.S. 23:1021(10)(a)(i) and (ii) and multiplying the average actual hours worked in those four weeks by Haynes's hourly wage rate establishes the average weekly wage at $350.00. This average weekly wage rate would yield a temporary total disability rate of $233.33. Accordingly, Haynes is entitled to retroactive payments of the difference between the temporary total disability benefits paid ($194.00) and those owed based on the correct average weekly wage calculation ($233.33), or $39.33 per week.

Penalties and Attorney Fees for Incorrect Payment of Temporary Total Disability Benefits
Haynes contends that the workers' compensation judge erred in failing to award penalties and attorney fees under La.R.S. 23:1201 for the incorrect payment of temporary total disability benefits. Because we have held that the workers' compensation judge erred in determining that LUBA paid Haynes the proper weekly benefit, we must review de novo the issue of penalties and attorney fees in this regard.
Louisiana Revised Statute 23:1201(B) and (F)(2) provides for the assessment of penalties and attorney fees for the failure to timely pay all compensation that is then due, unless the claim is reasonably controverted.
[I]n order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to *223 base his denial of benefits.... [A] court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed.
Brown v. Texas-LA Cartage, Inc., 98-1063, p. 9 (La.12/1/98); 721 So.2d 885, 890. In Brown, the claims adjuster contacted the employer and requested the employee's gross wages for the four weeks preceding his injury. The employee had worked less than forty hours a week in those four weeks due to a business slow down, so the claims adjuster used those figures instead of calculating the average weekly wage under La. R.S. 23:1021(10)(a)(i) based on a forty-hour work week. The employee's attorney advised the claims adjuster that the employee was a full-time worker and therefore entitled to increased benefits. The claims adjuster then contacted the employer, who confirmed that, although the employee had worked less than forty hours a week in the four weeks prior to the injury, he was hired as a full-time employee. The claims adjuster then recalculated the rate and increased the employee's benefits. The employee filed a claim for compensation, seeking penalties and attorney fees for, among other things, this miscalculation of benefits. The workers' compensation judge rejected the claim, and the court of appeal affirmed. The supreme court reversed, explaining:
[The employee] was not paid all compensation he was due until September 10 because, prior to that time, his average weekly wage was miscalculated. According to all the testimony presented, by both plaintiff and defendants, [the employee] was a full-time employee who was working less than forty hours a week due to a slow down in his employer's business. Notwithstanding the fact he was working less than forty hours a week, he was a full-time employee and his average weekly wage should have been calculated using the formula provided in La.R.S. 23:1021(10)(a)(i). The fact of his full-time status was not controverted by defendants by any evidence other than the claims adjuster's assertions that this was a "gray area" of the law. In fact, ... [the] owner of [the employer/business] testified that [the employee] was considered a full-time employee even though he did not always work forty hours a week. Similarly, the claims adjuster testified she had knowledge of [the employee's] full-time status when she calculated the rate for his temporary total disability benefits. When it was brought to her attention that [the employee] claimed he was due an increase in benefits because he was a full-time employee, the claims adjuster called the employer to confirm this fact and, when it was so confirmed, increased [the employee's] benefits and issued a check to make up the difference between what he was paid and what he should have been paid for the prior weeks. The insurer's vague allegations that this was a "gray area of the law" cannot serve to reasonably controvert the fact of plaintiff's full-time employment already agreed upon by [the employee] and [the employer].
Id. at 892 (footnotes omitted).
The defendants do not dispute that Haynes was considered a full-time employee. In that regard, a prerequisite to the application of the limited calculation of the average weekly wage under La.R.S. 23:1021(10)(a)(ii) rather than under the more expansive calculation of La.R.S. 23:1021(10)(a)(i) is the offer to the employee of "employment for forty hours or *224 more" which he rejected "regularly, and at his own discretion." Clearly, it cannot be seriously contended that Haynes was actually offered employment during the down times for rain and project changes which he rejected at his own discretion. Further, even if we were to find nonfrivolous the contention that Haynes's time off for the doctor appointments constituted the regular rejection of employment at his discretion, in most of those weeks the evidence shows that he could not have worked a forty-hour week even if he had not taken time off for the appointment and had been available to work. Thus, we find that LUBA engaged in a frivolous legal dispute regarding the application of La. R.S. 23:1021(10)(a)(ii).
In any event, even if the calculation of the average weekly wage had been proper under La.R.S. 23:1021(10)(a)(ii) instead of under La.R.S. 23:1021(10)(a)(i), the statute is clear that the four full weeks preceding the accident should be used to calculate the average weekly wage. As previously stated, we know that LUBA calculated the average weekly wage as $291.00. However, the claims adjuster who made these calculations did not testify at trial, and the claims adjuster who did testify did not explain which weeks were used to reach this total. In reviewing the two possible approaches used by LUBA as previously discussed, neither approach uses the four full weeks preceding the accident. Thus, we conclude that the use of the $291.00 figure was frivolous.
"[A]n unreasonable action cannot amount to a reasonable controversion." Id. at 893. We find that LUBA failed to reasonably controvert Haynes's claim for payment of the correct amount of temporary total disability benefits and therefore violated La.R.S. 23:1201(F) in that regard. However, we will reserve discussion of the assessment of the amount of penalties and attorney fees on this claim as well as the other claims in which Haynes seeks such awards to properly address the availability of multiple penalties for multiple violations.

Indemnity Benefits from July 14, 1999 through June 11, 2000
LUBA converted Haynes's temporary total disability benefits to supplemental earnings benefits beginning July 14, 1999 through June 11, 2000. The workers' compensation judge held that Haynes was not entitled to temporary total disability benefits during this period "because he had been found capable of working by both Drs. Dodson and Genoff." Haynes contends that the workers' compensation judge erred in that regard.
Dr. Dodson last saw Haynes on May 17, 1999, at which time he was of the opinion that Haynes was capable of gainful employment. Dr. Genoff saw Haynes on June 1, 1999, and he was of the opinion that Haynes was capable of gainful employment, although he was not sure what he was capable of performing with his left hand. Haynes's attorney even stipulated as follows: "I will stipulate we have never contended that his left hand is totally useless until the surgery. As a theoretical matter, I mean, issue I would say that ... he would be capable of light-duty work.... I just want the Court ... to understand that we're not claiming ... that this left hand, until he has the surgery, is totally useless to him. There's things he can do with his left hand and theoretically ... there's work out there... that he could do ... of a light nature, I think." In fact, Haynes was actually working in January, February, March, April, and May of 2000.
Louisiana Revised Statute 23:1221(1)(b) provides that compensation for temporary total disability shall not be awarded if the employee is engaged in any employment. *225 Clearly, Haynes was not entitled to temporary total disability benefits for the weeks in which he actually worked in January, February, March, April, and May of 2000.
Additionally, La.R.S. 23:1221(1)(c) provides that, whenever the employee is not engaged in any employment, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence that he is physically unable to engage in any employment, regardless of the nature or character of the employment. In light of the opinions of Dr. Dodson and Dr. Genoff that Haynes was capable of gainful employment and in light of the stipulation by Haynes's attorney that he was capable of performing light-duty work, we also find no manifest error in the workers' compensation judge's finding that Haynes was not entitled to temporary total disability benefits for the period in question in which he did not work. Thus, we affirm the workers' compensation judge's finding that Haynes was not entitled to temporary total disability benefits for the period from July 14, 1999 through June 11, 2000.

Penalties and Attorney Fees for Failure to Timely Pay Supplemental Earnings Benefits for July of 1999
Although LUBA converted Haynes's temporary total disability benefits to supplemental earnings benefits effective July 14, 1999, it did not pay Haynes any supplemental earnings benefits for the remainder of that month. Haynes contends that the workers' compensation judge erred in failing to impose penalties and attorney fees under La.R.S. 23:1201 for LUBA's failure to pay even supplemental earnings benefits for July of 1999.
"LSA-R.S. 23:1221(3) calls for a comparison of average monthly wages prior to the injury and average monthly wages the employee earns or is able to earn after the injury, with such comparison being made on a monthly basis." Touchet v. W.L. Estis Well Serv., 94-1402, p. 2 (La.App. 3 Cir. 4/5/95); 653 So.2d 808, 809. Louisiana Revised Statute 23:1221(3)(f) provides:
Any compensable supplemental earnings benefits loss shall be reported by the employee to the insurer or self-insured employer within thirty days after the termination of the week for which such loss is claimed. The director shall provide by rule for the reporting of supplemental earnings benefits loss by the injured worker and for the reporting of supplemental earnings benefits and payment of supplemental earnings benefits by the employer or insurer to the office and may prescribe forms for such reporting. The office, upon request by the employer or insurer, shall provide verification through unemployment compensation records under the Louisiana Employment Security Law of any claimed supplemental earnings benefits loss and shall obtain such verification from other states, if applicable.
LDOL-WC-1020 Form (Form 1020), entitled "Employee's Monthly Report of Earnings," is the appropriate form to be used by the employee in complying with this statute.
Haynes completed a Form 1020 for the period from July 1, 1999 through July 31, 1999, in which he asserted that he did not work during that period. However, he did not wait until the end of the month to complete the form but signed it on July 7. LUBA received the Form 1020 for July of 1999 on July 12. However, LUBA's claims adjuster testified that she did not pay Haynes any supplemental earnings benefits for July because she had not received the Form 1020 after Haynes's benefits were reclassified; instead, she had received it two days before the reclassification. LUBA does not contend that Haynes supplied false or incorrect information *226 on the Form 1020. Additionally, LUBA made no effort to contact Haynes concerning the form or any concerns it may have had.
In Mullins v. Courtney Equipment, 95-989 (La.App. 3 Cir. 1/31/96); 670 So.2d 329, the employer did not pay supplemental earnings benefits for the months of October and November of 1994 because the employee had not timely filled out the Form 1020. The employer also did not pay supplemental earnings benefits for the months of December of 1994 through the middle of February of 1995 because the employee had not filled out the Form 1020 completely. The employee first received notice of the conversion of his benefits from temporary total disability benefits to supplemental earnings benefits in a letter dated November 23, 1994. The employee promptly completed and returned the information requested by the employer. This court of appeal agreed with the workers' compensation judge that, this being the first notice of the conversion, the employer "callously withheld SEB benefit payments to [the employee] for the months of October and November 1994." Id. at 333. Concerning the months of December 1994 through the middle of February 1995, the employer asserted that it had withheld benefits because the employee failed to provide enough information on the Form 1020 about unemployment compensation, social security disability, and retirement benefits, even though it never notified the employee as to why it was withholding his benefits. We stated:
After a thorough reading of [La.R.S. 23:1221(3)(f)], we find that the hearing officer was reasonable in her decision. The defendant had no right or authority to withhold SEB payments in the aforementioned manner. The defendant should have contacted [the employee] if there was a problem with the forms. Also, the Office of Employment Security could have been contacted to verify possible supplemental earnings. However, stopping payment on defendant's own initiative is not a proper alternative under our law. This type of "stopping payments at will" places the injured worker at a grave disadvantage and makes a mockery of the humanitarian principles underlying our workers' compensation laws.
Id.
Thus, we affirmed the workers' compensation judge's award of attorney fees and increased the award of penalties in that regard.
The purpose of the Form 1020 is to aid the employer or insurer in timely calculating the correct amount of supplemental earnings benefits due the employee, not to provide a trap for the unwary employee or a loophole for the recalcitrant employer or insurer to avoid its obligation. In the instant case, as in Mullins, Haynes provided LUBA with a Form 1020 for the month of July. It was egregious for LUBA to withhold benefits merely because Haynes submitted the form two days prior to LUBA's reclassification of his status. This is particularly true since LUBA's claims adjuster had already informed Haynes that, if he did not allow Dr. Dodson to perform the approved surgery, his benefits would be reclassified to supplemental earnings benefits effective July 14, 1999. Therefore, Haynes's action in providing the appropriate form was in reaction to LUBA's position concerning his case. Essentially, LUBA avoided its obligation in a workers' compensation case on a mere technicality. Literally, it exalted form over substance in that it failed to timely pay supplemental earnings benefits for July of 1999, not because it did not timely have notice of Haynes's earnings for that month so that it could meet its obligations, *227 but because it had notice too early. Therefore, LUBA violated La.R.S. 23:1201(F) regarding its obligation to timely pay supplemental earnings benefits for that month, triggering penalties and attorney fees for that violation.

Penalties and Attorney Fees for Failure to Timely Authorize Surgery
At the trial on the merits, the workers' compensation judge concluded that LUBA was not arbitrary and capricious in contesting Haynes's requested change to Dr. Genoff as his treating physician. On appeal, Haynes seeks penalties and attorney fees, not for LUBA's contesting of the choice of physician, but for LUBA's delay in authorizing the surgery. Haynes points out that, even after the workers' compensation judge had ruled in his favor in February of 2000, LUBA did not authorize the surgery until May 2000. LUBA appears to argue on appeal that the issue is moot. We disagree.
In Skipper v. Acadian Oaks Hospital, 00-67 (La.App. 3 Cir. 5/3/00); 762 So.2d 122, the defendants did not authorize surgery until over two and a half months after being notified of the need for surgery. Defense counsel argued that the situation did not involve a failure to authorize surgery but involved merely a delay in authorizing surgery. We stated: "We find this insufficient to reasonably controvert [the employee's] request for medical treatment." Id. at 127.
In the instant case, even without regard to the ten-month delay between the time of the initial request for surgery and the authorization, we have found no nonfrivolous explanation in the record for the two-and-one-half-month delay in authorizing the surgery after being ordered to do so by the workers' compensation judge. LUBA has failed to reasonably controvert the claim, triggering penalties and attorney fees for the delay pursuant to La.R.S. 23:1201.

Penalties and Attorney Fees for Failure to Pay Medical and Travel Expenses
LUBA failed to pay Dr. Genoff's $261.00 statement for services rendered during the February 1, 2000 visit. Additionally, LUBA failed to reimburse Haynes's travel expenses of $50.40 in connection with that visit. The workers' compensation judge did not address the payment of these bills in the judgment, but on appeal Haynes seeks penalties and attorney fees for the nonpayment of these bills.[2] In their appellate brief, the defendants contend: "There was no prior authorization or request for payment by the employer.... The February 1, 2000 visit was a needless expense and a waste of time. Just because the court ultimately granted that the claimant undergo the surgery by Dr. Genoff, there is certainly nothing `retroactive' about the granting of that relief to allow for arbitrary exams at the request of claimant's attorney that were not pre-authorized by the employer."
La.R.S. 23:1121(B) provides:
The employee shall have the right to select one treating physician in any field or specialty. The employee shall have a right to the type of summary proceeding provided for in R.S. 23:1124(B), when denied his right to an initial physician of choice. After his initial choice the employee shall obtain prior consent from the employer or his workers' compensation carrier for a change of treating physician within that same field or specialty. *228 The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.
In Lemoine v. Hessmer Nursing Home, 94-836, p. 18 (La.App. 3 Cir. 3/1/95); 651 So.2d 444, 454-55, we explained:
Louisiana Revised Statutes 23:1121 must be read in conjunction with the other provisions of Title 23, including Louisiana Revised Statutes 23:1203, which provides in part that:
A. In every case coming under this Chapter, the employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any non-medical treatment recognized by the laws of this state as legal, and shall utilize such state, federal, public, or private facilities as will provide the injured employee with such necessary services. (emphasis added).
This article has been interpreted by this court to allow an employee to recover medical expenses for treatment by a physician incurred without seeking approval from the employer even though the employee had been examined by two other physicians in the same field. Stelly v. United Parcel Service, 600 So.2d 156 (La.App. 3d Cir.1992). The only requirement is that the hearing officer conclude the treatment is both reasonable and necessary to alleviate the claimant's symptoms. The employer is then bound to provide for those expenses with the exception of the initial unauthorized visit. Id.

LUBA does not contest the medical necessity of the surgery or even the arthroscopy in fact, it had already authorized surgery with Dr. Dodson. Rather, LUBA contests on appeal the necessity of the February 1, 2000 visit with Dr. Genoff. The record supports the necessity of the visit, and LUBA offered no evidence at trial to show that the visit was not necessary. Any lack of medical necessity cannot now at this late date provide LUBA with a safe haven.
LUBA also contests payment for the February 1, 2000 visit on the basis that Haynes failed to obtain prior approval for the visit. La.R.S. 23:1121(B) protects the employer from the employee's doctor shopping. The workers' compensation judge specifically made a finding that Haynes was not doctor shopping when he requested Dr. Genoff as his treating physician. LUBA obviously did not disagree with Dr. Genoff's expertise or with his involvement in the case since the doctor became involved in the case at LUBA's request. Dr. Genoff recommended the arthroscopy in addition to the surgery, and LUBA did not want Haynes being treated by its "choice of physician" as expressed in its answer: "Defendant admits that it has rejected petitioner's request to change physicians to Dr. Michael Genoff, as same [h]as already previously been selected by the employer as the employer's choice of physician." Essentially, LUBA attempted to dictate which of the physicians involved in the case could perform the surgery. The Workers' Compensation Act is intended to be remedial and not superfluously litigious in nature. We would think that an employer/insurer should be exceedingly glad to have the employee agree to treatment with a physician in which it placed confidence. In any event, we are not aware of any provision in the Workers' Compensation Act that would prohibit an employee from undergoing surgery with the physician the employer chose to have examine the employee. We have held that La.R.S. 23:1121 does not grant the employer/insurer the right to select the physician to conduct diagnostic testing. See Louisiana Clinic v. Patin's Tire Serv., 98-1973 *229 (La.App. 3 Cir. 5/5/99); 731 So.2d 525. Likewise, we have found nothing in La. R.S. 23:1121 granting the employer/insurer the right to select the physician who performs the surgery that has already been authorized or the right to prevent the employee from using the "employer's physician." We find that LUBA should have paid Dr. Genoff's bill and the medical travel expenses for the February 1, 2000 visit and that LUBA did not reasonably controvert the claim for these bills. Thus, it is subject to penalties and attorney fees in that regard. We note that Haynes has not appealed the workers' compensation judge's finding that LUBA was not arbitrary and capricious for contesting his request for a change of physician to Dr. Genoff, so we may not grant any relief in that regard on appeal.

Attorney Fees and Multiple Penalties
The workers' compensation judge awarded penalties of $2,000.00 and attorney fees of $2,500.00 for LUBA's failure to pay medical bills incurred on the date of the accident. We have found that, additionally, LUBA unreasonably delayed authorization for the surgery with Dr. Genoff and failed to reasonably controvert Haynes's claim for payment of Dr. Genoff's bill and the medical travel expenses for February 1, 2000. Also, we have found that LUBA failed to reasonably controvert Haynes's claim for payment of the correct amount of temporary total disability benefits and failed to reasonably controvert Haynes's claim for timely payment of supplemental earnings benefits for the month of July 1999. Haynes seeks attorney fees and separate penalties for each of these violations.
In Fontenot v. Reddell Vidrine Water District, 00-762 (La.App. 3 Cir. 2/21/01); 780 So.2d 1197, writ granted, 01-752 (La.5/11/01); 792 So.2d 1, this court held that, while an employee may receive separate penalties for both indemnity and medical benefits claims, the employee in the case at bar was entitled to receive only one penalty for the insurer's failure in two respects, i.e., its miscalculation of indemnity benefits and its improper reduction of benefits. The author of the instant opinion dissented in Fontenot, stating in part:
Under La.R.S. 23:1201(F), it is the "[f]ailure to provide payment in accordance with this Section [La.R.S. 23:1201]" that "shall result in the assessment of a penalty." Pursuant to La.R.S. 23:1201(B), (C), and (D), "all such compensation then due" must be paid and it must be paid within the time specified. Additionally, pursuant to La.R.S. 23:1201(E), "[m]edical benefits payable" must be paid within the specified time. Thus, Subsections (B), (C), (D), and (E) essentially place two requirements on the employer/insurerpayment of the correct amount of benefits and timely payment of those benefits.
An employer/insurer can violate these requirements in a number of ways. In the instant case, LWCC violated Subsection (B) by initially miscalculating the benefits and then again by improperly reducing TTD benefits to SEB. LWCC also violated Subsection (E) by failing to authorize emergency medical treatment. The majority suggests that the two separate violations of Subsection (B) give rise to only one penalty. In reaching this conclusion, the majority suggests that Mr. Fontenot has attempted to have the court "equate the word `claim' with `violation.'" While I concede that each instance of a continuing violation does not give rise to a new claim, each new claim requires a violation on the part of the employer/insurer. Importantly, when an employer/insurer miscalculates the benefits due, that is a violation which gives rise to a claim. *230 Additionally, when that same employer/insurer improperly reduces the benefits being paid from TTD benefits to SEB, that transgression is a separate violation which gives rise to a separate claim. The former action has nothing to do with the latter. In the matter before us, the workers' compensation judge found two separate violations which gave rise to two separate claims under La.R.S. 23:1201(F). I have difficulty seeing how it can be interpreted any other way.
Through La.R.S. 23:1201(F), the employee has a means of discouraging such violations and motivating the recalcitrant or indifferent employer/insurer to comply with its obligations. As quoted by the majority, Williams v. Rush Masonry, Inc., 98-2271, p. 8 (La.6/29/99); 737 So.2d 41, 46, recognized that awards of penalties and attorney fees are "imposed to discourage indifference and undesirable conduct by employers and insurers."
The focus is on the conduct of the employer/insurer. An employer/insurer may exhibit indifference and undesirable conduct toward the employee in different ways, at different times and/or regarding different elements of an item of benefits to which the employee is entitled. However, as I appreciate the majority's interpretation, the employee may seek penalties to discourage the indifference and undesirable conduct of the employer/insurer only once concerning compensation benefits and only once concerning medical benefits. As such, the employer/insurer has carte blanche to behave as it wishes, and that without further consequence. Thus, the benefit/leverage given to the employee through La.R.S. 23:1201(F) is stripped away upon the first violation, and the employee is thereafter subject to the whim and caprice of the employer/insurer. Conceivably, an employer/insurer could initially refuse to pay mileage reimbursement due for medical travel, pay a $2,000.00 penalty in that regard, and then unreasonably delay payment of the more expensive medical services. In essence, the majority opinion extends the res judicata effect of the initial penalty award to all future violations by the employer/insurer, despite the employer/insurer's continuing obligation to provide benefits.
If, however, the majority opinion authorizes not just one penalty for the duration of the employer/insurer's obligation to pay benefits but authorizes one penalty for each 1008 claim that is filed, then the number of penalties the employee could recover would be controlled by the fortuity of the timing of the violations or his attorney's acumen in filing multiple 1008 forms for violations occurring within the same time frame. Thus, the employee encounters a form-over-substance situation, when it is the substance that should control, i.e., the employer/insurer's conduct, and not the form/timing of the presentation of the situation to a workers' compensation judge. A resourceful employee will be better served by filing separate 1008 forms for separate violations to preserve his penalty rights under La.R.S. 23:1201 for each individual claim. Of course, as argued by counsel for LWCC, the employer/insurer would surely seek consolidation of these claims, thus returning the injured employee to the penalizing effect of this majority decision. Of course, the employer/insurer would also raise the exception of res judicata, even for future actions, if penalized once.
Essentially, the majority's holding chips away at the quid-pro-quo arrangement contemplated by the legislature *231 when it limited the employee to workers' compensation benefits.
Id. at 1201-03.
The dissent in Fontenot is in accord with the second circuit's decision in Harvey v. B.E. & K. Construction Co., 34,057, pp. 8-10 (La.App. 2 Cir. 11/15/00); 772 So.2d 949, 954-55, writ denied, 00-3560 (La.3/9/01); 786 So.2d 732, in which the court stated:
The statute allows an award of penalties and fees for "each disputed claim" provided that the penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. The word "claim" is not defined in La. R.S. 23:[1201]. In Ross v. Highlands Ins. Co., 590 So.2d 1177 (La.1991), in deciding whether the OWC or the district court had jurisdiction over an action to enforce a judgment, the court observed:
The term "claim" is nowhere defined in the Worker's Compensation Act. Nonetheless, it is clear from the context of provisions using the term that the underlying claim for relief is what is meant, not the enforcement of a judgment. A claim is initiated by the filing of a petition with the OWC once an issue surfaces which the parties cannot themselves resolve. La. R.S. 23:1310; H. Johnson, 14 Louisiana Civil Law TreatiseWorker's Compensation, Sec. 381.10 (West 1991). An action for enforcement of a judgment is not the same thing as an action on an underlying claim, nor is it a "new claim."
If "claim" refers to the underlying demand for compensation benefits and not to a demand for a particular benefit, then a worker would be limited to a single penalty and attorney fee against an employer regardless of the employer's repeated arbitrary and capricious failure to pay benefits.
Although the term "claim" may generally refer to the underlying claim for workers' compensation, we believe that in this section the term has a more specialized meaning. The underlying reason for the workers' compensation provisions allowing the imposition of penalties and attorney fees for the arbitrary and capricious withholding of benefits is to combat the indifference by employers and insurers toward injured employees. Ward v. Phoenix Operating Company, 31,656 (La.App.2d Cir.2/24/99), 729 So.2d 109. In Gay [v. Georgia Pacific Corp., 32,653 (La.App. 2 Cir. 12/22/99); 754 So.2d 1101,] this court decided that the triggering event for penalties and attorney fees is not the injury giving rise to the compensation claim, but instead is the employer's or insurer's failure to comply with the procedures set forth in La. R.S. 23:1201. Interpretation of "claim" as a specific demand for particular benefits (such as an operation) rather than as a general demand for benefits under the compensation laws is consistent with the Gay rationale. As in Gay, "to conclude otherwise would dilute the deterrent effect of these statutory provisions, which are not intended to make the worker `whole' but rather to discourage specific conduct on the part of the employer." As the dissent in LeJeune [v. Trend Services, Inc., 96-550 (La.App. 3 Cir. 6/4/97); 699 So.2d 95, 101,] states:
The most serious problem with [this rationale] is that once an employer/insurance company has committed enough violations to exhaust the $2,000.00 penalty limit, regarding either compensation or medical benefits, as in the instant case, the employee, for as long as he or she lives, has no protection against future infractions of arbitrary and capricious behavior.
*232 We agree.
The panel in the instant case agrees with the second circuit in Harvey and adopts the dissenting opinion in Fontenot. Therefore, we amend the judgment to award a $2,000.00 penalty for LUBA's incorrect calculation of temporary total disability benefits and a $2,000.00 penalty for LUBA's failure to timely pay supplemental earnings benefits in July of 1999 for a total of $4,000.00 in penalties in connection with the indemnity benefits. We also amend the judgment to award, in addition to the penalty already awarded, a $2,000.00 penalty for LUBA's failure to timely authorize surgery with Dr. Genoff and a $2,000.00 penalty for LUBA's failure to pay the February 1, 2000 bill for the visit with Dr. Genoff and the related travel expenses for a total award of $6,000.00 in penalties in connection with the medical benefits. We reject Haynes's contention that separate penalties should have been awarded for each of the medical bills incurred at Cabrini Hospital on the date of the accident and for the February 1, 2000 visit to Dr. Genoff and the related travel expenses. LUBA's actions regarding the Cabrini bills are essentially a single violation, and its failure to pay the bill for the visit to Dr. Genoff and the related travel expenses is essentially a single violation. We award attorney fees of $15,000.00 in addition to the attorney fees of $2,500.00 previously awarded by the workers' compensation judge.

Discontinuance of Vocational Rehabilitation
Haynes contends that the workers' compensation judge erred in failing to address the arbitrary discontinuance of vocational rehabilitation, and he seeks attorney fees in that regard. Haynes moved to Breaux Bridge after his injury, and it appears that he specifically takes issue with LUBA's failure to attempt to locate a job for him in the Breaux Bridge area.
By June of 1999, both Dr. Dodson and Dr. Genoff were of the opinion that Haynes was capable of gainful employment. WFA offered Haynes a modified light-duty job by letter dated January 18, 2000. However, that job was available in its geographic region, the Pineville area. The employer is required to prove that the job was available to the employee in either "the employee's or employer's community or reasonable geographic region." La.R.S. 23:1221(3)(c)(i). Although the Pineville area was no longer in Haynes's community or reasonable geographic region due to his move, it was in WFA's community or reasonable geographic region. Thus, this assignment of error is without merit.

Discontinuance of Indemnity Benefits Following Surgery
Haynes seeks attorney fees on the basis that LUBA arbitrarily discontinued his temporary total disability benefits following his arthroscopy on June 12, 2000. The record reflects that LUBA paid only one week of temporary total disability benefits because Dr. Genoff had testified in his deposition of May 18, 2000, that the recovery period for the arthroscopy would probably be a week. However, in his deposition of July 14, 2000, Dr. Genoff testified that the recovery time from the arthroscopy would probably be about six weeks. On July 18, 2000, LUBA issued a check for benefits for the period from June 19, 2000 through July 23, 2000. The workers' compensation judge did not award attorney fees for the discontinuance, and we find no manifest error in that regard. LUBA was not arbitrary in relying on Dr. Genoff's deposition of May 18, and it reinstated benefits retroactive to the discontinuance upon discovering the different recovery period given by Dr. Genoff in his subsequent deposition.

*233 Interest

The judgment is silent regarding legal interest, and Haynes contends that the workers' compensation judge legally erred in refusing to provide for legal interest. "The fact that a workers' compensation judge is silent as to legal interest in his judgment does not constitute denial of such interest; legal interest is mandatory under the workers' compensation statute.... This interest automatically attaches until judgment is satisfied, whether prayed for in petition or mentioned in judgment." George v. Guillory, 00-591, pp. 16-17 (La.App. 3 Cir. 11/2/00); 776 So.2d 1200, 1211. Thus, this assignment of error has no merit.

Costs
The workers' compensation judge held the parties responsible for the payment of their own costs. Haynes contends that the judge erred in requiring him to pay his own costs. "Awards of court costs and expert witness fees fall within the sound discretion of a hearing officer. However, while court costs may be properly cast against a losing litigant, it is generally an abuse of discretion to cast a largely successful worker's compensation claimant with court costs and to deny that claimant expert witness fees." Hood v. C.J. Rogers, Inc., 94-1162, pp. 3-4 (La. App. 3 Cir. 3/8/95); 654 So.2d 371, 374 (citations omitted). Having found that the workers' compensation judge erred in several respects, such that Haynes has been largely successful in his workers' compensation case, we reverse the award of costs and tax all costs to LUBA.

DISPOSITION
For the foregoing reasons, we amend the judgment to reflect the proper rate for temporary total disability benefits as $233.33 a week, and we award $39.33 a week retroactive for the entire period of temporary total disability. We additionally amend the judgment to award a $2,000.00 penalty for LUBA's incorrect calculation of indemnity benefits, a $2,000.00 penalty for LUBA's failure to timely pay supplemental earnings benefits for July of 1999, a $2,000.00 penalty for LUBA's failure to timely authorize surgery with Dr. Genoff, and a $2,000.00 penalty for LUBA's failure to pay the February 1, 2000 bill for the visit with Dr. Genoff and the related travel expenses. We also amend the judgment to award an additional $15,000.00 in attorney fees. We reverse the assessment of costs against Haynes and tax all costs of trial and appeal to WFA and LUBA. We affirm the judgment in all other respects.
AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[1] The workers' compensation judge also held that LUBA was "neither an employer nor an insurer, and is thereby dismissed from these proceedings." However, the parties stipulated at trial that "LUBA was at all times the workers' compensation provider." In Ramsey v. Cash & Carry Foods, Inc., 95-544 (La. App. 3 Cir. 11/2/95); 664 So.2d 511, the workers' compensation judge cast judgment against only the employer even though the employer and a self-insurer's fund were named as defendants in the claim filed. Citing La.Code Civ.P. art. 2164, which provides that an "appellate court shall render any judgment which is just, legal, and proper upon the record," we amended the judgment to include the self-insurer's fund as a party against whom judgment was cast. Likewise, in the instant case, we amend the judgment to include LUBA as a party against whom judgment was cast.
[2] For whatever reason, Haynes has not asked for an award of those expenses but only for an award of penalties and attorney fees for those expenses. Thus, we cannot award those expenses.