TOBIAS, Judge.
 

 |tIn this workers’ compensation case, both the claimant and the workers’ compensation insurer have appealed the judgment by the Office of Workers’ Compensation (“OWC”). After reviewing the record and applicable law, we reverse the award of mileage and amend the medical expenses. In all other respects, the judgment is affirmed.
 

 The claimant/appellee/cross-appellant, Bruce L. Feingerts (“Feingerts”), was involved in a traffic accident on 8 February 2001, when his vehicle was struck from behind by a large truck. Feingerts, a New Orleans attorney, was on his way to the airport for a flight to Washington, D.C. for business. Feingerts stayed at the accident scene while the police investigated the accident. He testified that his head felt “scrambled” by the impact. When the police were finished, Feingerts drove to Walgreens to purchase something for his headache, and then went home. He stated that upon arriving at his house, he vomited to the point of dry heaves, called his teenage son, Bradley, and laid down. When Bradley arrived, he found his father’s car parked in front of a neighbor’s house with its trunk smashed and his father visibly “out of it.” He took his father to the emergency room of a local |2hospital. Bradley testified to his father’s strange behavior while at a pharmacy to pick up the prescriptions issued in the emergency
 
 *361
 
 room; he believed his father had suffered a serious concussion and had some memory loss.
 

 The initial diagnosis was a cervical strain. Feingerts decided to attend to his business in Washington despite the accident. He flew to Washington the next morning, but was unable to leave the bed in his hotel room, experiencing neck and back pain, headaches, and minor abdominal pain.
 

 After returning to New Orleans, Fein-gerts saw a neurologist who treated him conservatively with a soft neck collar and medication. Feingerts states that the headaches were so severe that they interfered with his ability to practice law. An orthopedist restricted him to four to six hours of work per day. Once the headaches subsided, Feingerts attended physical therapy. He sought medical treatment for a variety of medical conditions which he claims were caused by the accident.
 

 In 2007, Feingerts underwent neck surgery in which two discs were removed and the affected areas were fused with cadaver bone. The effect of the surgery relieved Feingerts’ neck pain, allowing him to cease the use of pain medication, and restored neurological function to his left arm.
 

 Feingerts contends that the abdominal pain did not resolve for 19 months. He asserts that he has suffered permanent bladder and bowel dysfunction due to nerve-root impingement of the spine. He has been seeing a psychiatrist for depression since 2002 and asserts that a neurop-sychologist found significant | ¡¡neurological defects attributable to the accident. Fein-gerts complains of his inability to concentrate and short-term memory loss that have affected his ability to practice law since the accident.
 

 Appellant/cross-appellee, American Casualty Company of Reading, PA (“American”) provided a policy of workers’ compensation insurance to Feingerts’ law firm, Feingerts and Kelly. American agreed to the request for a stipulation that the accident occurred while in the course and scope of Feingerts’ employment. However, American disputed the medical causation of Feingerts’ numerous medical complaints, the details of the accident and its impact on him, the nature and extent of Feingerts’ injuries, and his entitlement to indemnity benefits.
 

 The matter was tried on May 2007 with a judgment rendered in October 2007. The OWC concluded that Feingerts failed to prove that he sustained a permanent brain injury resulting from the accident and was not entitled indemnity benefits or penalties and attorney’s fees. However, the OWC held that Feingerts could recover payment for his medical treatment in the amount of $187,661.95, and related mileage for certain injuries that were caused or exacerbated by the accident. The OWC also awarded all costs associated with depositions and expert physicians.
 

 On 26 October 2007, American filed a motion for clarification and amendment of the judgment, or, in the alternative, motion for new trial for reargument only. On the same date, Feingerts also filed a motion for new trial.
 

 |4On 21 April 2008, the OWC granted a new trial and held that the only new evidence Feingerts could introduce was that relating to his brain injury. The new trial took place in December 2008; it consisted of argument and the introduction of evidence relative to the brain injury claim. The amended judgment was fairly consistent with the first judgment. Ultimately, the OWC held that any injury not specifically listed within the body of the judgment was not related to or caused by the accident at issue. Again, the OWC determined that American was responsible for
 
 *362
 
 the payment of medical bills and mileage, excluding payment of those costs associated with any evaluation of Feingerts that took place outside Louisiana. The rest of the judgment remained the same.
 

 American has assigned two errors for our review. First, it contends that the OWC erred by concluding that the accident caused or exacerbated the physical injuries or conditions enumerated in the judgment. Second, American argues that it should not be responsible for Feingerts’ medical bills and expenses, out-of-pocket expenses, mileage, and legal interest when Feingerts did not prove the treatment modalities and costs owed.
 

 Feingerts also appealed, alleging that the OWC erred by failing to award (1) supplemental earning or temporary total disability benefits; (2) medical expenses incurred with the treatment of his lower back; (3) expenses incurred in connection with the 2007 brain scan; and (4) penalties and attorney’s fees.
 

 |5The Louisiana Supreme Court set out the standard of review to be employed in workers’ compensation cases in
 
 Banks v. Industrial Roofing & Sheet Metal Works, Inc.,
 
 96-2840, pp. 7-8 (La.7/1/97), 696 So.2d 551, 556 (citations omitted):
 

 Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review. In applying the manifest error — clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.
 

 American’s first assignment of error concerns factual findings made by the OWC. Specifically, the OWC held that the accident caused or exacerbated the following physical and mental injuries:
 

 1. mental confusion;
 

 2. concussion;
 

 3. cervical injury requiring surgery;
 

 4. weight gain;
 

 5. depression;
 

 6. urinary incontinence;
 

 7. fecal in continence; and
 

 8. sexual dysfunction.
 

 However, OWC found that Feingerts did not carry his burden of proof that he sustained a permanent brain injury as a result of the accident.
 
 [1]
 

 An employee is entitled to compensation benefits if he or she suffers a personal injury by an accident arising out of and in the course of employment. La. R.S. 23:1031. The Supreme Court has stated that under this statute a successful claimant’s proof must show personal injury which is the result of an accident, which accident arises out of and in the course of employment.
 
 Buxton v. Iowa Police Department,
 
 09-0520, pp. 11-12 (La.10/20/09), 23 So.3d 275, 283. The [(¡chain of causation required by the statutory scheme as adopted by the legislature in La. R.S. 23:1031 is that the employment causes the accident, the accident causes injury, and the injury causes disability. The employee has the burden of proving, by a preponderance of the evidence, that the resulting disability is related to an on-the-job injury.
 
 Id.
 
 at p.12, 23 So.3d at 283.
 

 The parties introduced numerous doctors’ depositions, along with doctors’ evaluations, letters, and test results. Some of those physicians related Feingerts’ injuries to the accident, while others did not. The
 
 *363
 
 OWC also heard Feingerts’ testimony over a period of three and one-half days. Based on our review of the record, we find that the OWC was clearly wrong in some of its findings, as discussed herein.
 

 Mental Confusion/Concussion:
 

 Feingerts suffered from sleep apnea before the accident; he first sought treatment for the condition in 1994. Many of the doctors testified that both a mild concussion and sleep apnea would produce the same symptoms: morning headaches, poor concentration, memory loss, depression, and fatigue. In fact, Feingerts had several of the risk factors for sleep apnea, such as being male, being overweight, and having physical abnormalities that were not caused by the accident. Sleep studies before and after the accident yielded the same diagnosis of severe obstructive sleep apnea. The studies also demonstrated that Feingerts could sleep normally when using a Continuous Positive Airway Pressure (“CPAP”) system; however, Fein-gerts refused to use the equipment.
 

 17Gregory S. Ferriss, M.D., a neurologist and sleep specialist, began treating Fein-gerts for sleep apnea in 1994. He indicated that the sleep studies performed both before and after the accident indicated severe obstructive sleep apnea, which was effectively treated by CPAP. He prescribed CPAP on at least two occasions, but Feingerts said he could not tolerate it. A dental appliance was effective except when he slept on his back or in REM sleep, but not as effective as the CPAP. Dr. Ferriss also noted that during his course of treatment of Feingerts for almost a decade, Feingerts failed to follow good sleep hygiene, which also contributed to his problems. He last saw Feingerts in February 2002.
 
 [2]
 

 In September 2003, N. Knight Worley, M.D., performed surgery on Feingerts’ palate, tongue, and nose to relieve the condition. A sleep study in June 2003 showed improvement but he still suffered from mild to moderate sleep apnea. Depending on the doctor, Feingerts reported a continued problem with sleep apnea or that the problem had been resolved and no longer a factor to his then present complaints. However, because the sleep apnea was not caused or aggravated by the accident, we find the cost of subsequent treatment and/or tests for sleep apnea cannot be recovered from American.
 

 William Oser, III, M.D., a neurologist, saw Feingerts on 13 February 2001, just five days after the accident. At that time, Feingerts reported that he had recently been in a motor vehicle accident where his vehicle was struck from behind. In taking the history, Dr. Oser was not told that the claimant “may” have Rstruck his head on the steering wheel as he later told his other doctors.
 
 [3]
 
 Dr. Oser testified that he saw no bruising on Feingerts face five days after the accident. The MRI brain studies ordered by Dr. Oser were normal and he never saw any objective or cognitive evidence of a brain injury.
 

 Dr. Oser diagnosed Feingerts with “post-concussion syndrome,” a condition that usually resolves itself on its own in six weeks to six months. When Dr. Oser saw the claimant in January 2003, he could not say whether the continued complaints of headaches and poor concentration resulted
 
 *364
 
 from the accident or the sleep apnea. He had never heard of a post-concussion syndrome lasting years without some objective evidence of a head injury.
 

 No doctor witnessed Feingerts’ complaints of poor concentration, slurred speech, poor vocabulary, or forgetfulness. In fact, his many doctors stated that his speech was spontaneous and fluent, he was quite articulate, he answered questions appropriately, and he had no problem recounting his extensive medical history since the accident. As stated above, no medical doctor found any objective evidence of a brain injury, except for Paul G. Harch, M.D., who specializes in hyperbaric medicine.
 
 [4]
 

 | nDr. Harch first saw Feingerts on 10 August 2004. He had been referred by a neurologist and a neuropsychologist for Hyperbaric Oxygen Treatment (“HBOT”). Dr. Harch admitted that HBOT is not used extensively for closed head trauma and has not been approved by the FDA for that purpose. He also agreed that no objective evidence of a brain injury was found. All Dr. Harch could point to was a single-photon emission computed tomography (“SPECT”) brain scan that indicated a diffuse heterogeneous .pattern that was consistent with a diagnosis of post-concussion syndrome,
 
 among other
 
 diagnoses. This pattern improved after just one HBOT, however, Dr. Harch stated that (1) the pattern could have been caused by other events and (2) reading a SPECT is not an exact science. Dr. Harch stated that he believed Feingerts’ description of the accident but was not called upon to give an opinion on causation. Although Dr. Harch prescribed 40 courses of HBOT, Feingerts only kept 32 appointments.
 

 While Feingerts may have suffered a mild concussion from the accident, the doctors agreed that the condition would have resolved on its own with six months to a year. For post-concussion syndrome to last beyond that period, objective findings of a brain injury would be present. We do not find Dr. Harch’s testimony persuasive in light of the overwhelming testimony to the contrary. In addition, because the trial court did not find that Feingerts’ sleep apnea was caused by the accident, American is not responsible for treatment of that condition post accident, save the initial studies performed by Dr. Ferriss in 2002.
 

 | ^Hypertension:
 

 We also find no evidence in the record that Feingerts’ hypertension was related to the accident. He has a family history of hypertension and no doctor testified that the accident more probably than not caused this condition. He cannot recover medical expenses for conditions unrelated to the accident.
 

 
 *365
 
 Urinary and Fecal Incontinence/Sexual Dysfunction:
 

 The trial court found that these conditions were caused by the accident. On the other hand, the court excluded Feingerts’ claim of a low back injury. We agree that the record does not support the existence of a low back injury. No doctor testified that it was more probable than not that a cervical injury can cause these conditions. In fact, Neil Baum M.D., a urologist, specifically related the incontinence and sexual dysfunctions to lumbar herniations at the L3-4 and L4-5 interver-tebral discs. Because the evidence supports a finding that the accident did not cause Feingerts’ low back injury, that injury could not have caused these conditions.
 

 Cervical Injury Requiring Surgery:
 

 The primary injury for which the claimant sought treatment was a cervical injury that eventually required surgery. Feingerts saw several doctors for this condition and received various opinions as to whether the injury was related to the accident.
 

 It is undisputed that x-rays and MRIs taken shortly after the accident were negative for a cervical disc injury, but showed cervical spondylosis or degenerative chronic changes in the neck from normal wear and tear. However, MRIs taken in 2004, 2005, and 2006 revealed a multilevel herniation requiring surgery. Feingerts consulted with at least three orthopedic spine surgeons and, in January 1^2007, Richard L. Corales, Jr., M.D., performed neck surgery. Dr. Corales testified that the herniated discs were caused by the accident. Despite testimony to the contrary given by several doctors, we cannot say that the trial court was manifestly erroneous in making this determination, although we might rule differently if such was our duty.
 

 Weight Gain:
 

 We are puzzled by the trial court’s finding that Feingerts’ weight gain was caused by the accident when the record does not contain evidence to support this conclusion. In addition, no evidence exists that Feingerts sought medical treatment for this condition or that any medical expenses were incurred. Consequently, we find that the trial court erred in making this finding for it is manifestly erroneous.
 

 Depression:
 

 We have reviewed the testimony by Christopher D. Meyers, M.D., a psychiatrist, and Susan Andrews, Ph.D., and William Black, Ph.D., both neuropsychologists who performed neuropsychological evaluations on the claimant, on the issue of Fein-gerts’ depression. Dr. Meyers testified that Feingerts’ depression was caused by the accident and Dr. Andrews testified that his psychiatric state and impaired functionality level were also related to the accident. Dr. Black, who found inconsistent test results that could not be explained, testified that he believed that Feingerts was most likely suffering from somatoform disorder,
 
 [5]
 
 a mental disorder characterized by physical symptoms that mimic physical disease or injury for which no identifiable physical cause exists, or possibly hypochondria, another mental disorder where a person has an excessive | ^preoccupation or worry about having a serious illness. However, neither Dr. Andrews nor Dr. Black found that Feingerts was disabled from a psychological perspective.
 

 
 *366
 
 When asked if sleep apnea could cause depression, every doctor questioned answered in the affirmative. Dr. Meyers determined that Feingerts had no cognitive deficits but diagnosed him with depression. In a letter dated 24 May 2004 from Dr. Meyers to the claimant’s attorney, he stated:
 

 It remains my opinion that his psychiatric problems with mood, focus, and motivation, as well as the aggravation of problems with his sleep, are attributable to the head injury he suffered in his accident.
 

 However, because we agree with the trial court that Feingerts did not suffer a permanent brain injury in the accident, we cannot rely on Dr. Meyers’ opinion in this regard. All the neurologists agree that a mild concussion would have resolved itself by the time Feingerts began seeing Dr. Meyers in April 2003, more than two years post-accident.
 

 An independent psychiatric examination was performed in late 2004 by Richard Roniger, M.D., who agreed that Feingerts was depressed. He made the diagnosis of a “pain disorder” patient, who presents with complaints centering on physical pain. He explained that a pain disorder can exist with an emotional condition, such as depression and anxiety, and is influenced by psychological factors. Dr. Roniger agreed that a diagnosis of pain disorder would encompass the things that a somatoform disorder would also incorporate, the diagnosis made by Dr. Black.
 

 | [.¡Although sleep apnea can cause depression, we cannot say that the trial court was manifestly erroneous in finding that Feingerts’ depression was the result of, or possible aggravated by, the accident. Even if Feingerts is suffering from some other mental disorders as opined by Drs. Roniger and Black, they appear to have been triggered by the accident. It is a well-known principle of law that one takes a victim as he finds him. Without evidence of Feingerts’ mental condition prior to the accident, we agree with the OWC.
 

 American’s second assignment of error concerns the awards for medical expenses and mileage associated with the medical treatment Feingerts received. Specifically, American argues that the sole evidence in the record of what medical expenses are owed was a list compiled by Feingerts of all the medical expenses allegedly owed him. It also argues that Feingerts is not entitled to reimbursement for the medical expenses paid by his private health insurance.
 

 We have examined the record on appeal and find that “Book A” of Feingerts’ exhibits contains an itemized list of his medical bills totaling $187,661.95. However, behind the itemized list are copies of the actual medical bills incurred by him. Most of the bills demonstrate or disclose what treatment was received and who paid for the treatment, whether Feingerts himself or his private health insurer. However, because the records contain medical bills for conditions not caused by the accident as analyzed above, we reduce those amounts to the amounts set forth as follows:
 

 1. Dr. Susan Andrews $ 4,400.00
 

 2. Dr. Bradley Bartholomew (neurosurgeon) 4,414.00
 

 3. Dr. Neil Baum not related
 

 4. Dr. Siddharth Bhansali (hypertension) not related
 

 5. Dr. Richard Corales 23,501.00
 

 6. Southern Orthopedic Specialists 4,327.00
 

 7. Dr. Paul Harch not related
 

 Im8. Dr. Stephen Harkness (tests for hernia) 642.00
 

 
 *367
 
 9.Dr. Robert Link (ER doctor) 178.94
 

 10. Dr. Christopher Meyers 14,040.00
 

 11. Dr. Frank Oser, III 645.00
 

 12. Advanced Neurological Center 4,761.00
 

 13. Dr. Charles Smith (internist/family doctor) not related
 

 14. Diagnostic Imaging 3,812.00
 

 15. East Jefferson General Hospital (surgery) 54,414.00
 

 16. ER Doctors 235.00
 

 17. Memorial Medical Center (tests) 6,891.00
 

 18. Mercy-Baptist Radiology 635.00
 

 19. Stand-Up Open MRI 9,600.00
 

 20. Tulane University Hospital (physical therapy) 3,856.50
 

 21. Walgreens 4,923.63
 

 We also excluded $175.00 charged by Dr. Andrews and $2,040.00 charged by Dr. Meyers for those appointments Feingerts missed. The amounts set forth above reflect these deductions.
 

 American also contends that it is entitled to an offset for those amounts paid by Feingerts’ private health insurer pursuant to La. R.S. 23:1212, which provides in pertinent part:
 

 A. [P]ayment by any person or entity, other than a direct payment by the employee, a relative or friend of the employee, or by Medicaid or other state medical assistance programs of medical expenses that are owed under this Chapter, shall extinguish the claim against the employer or insurer for those medical expenses. This Section shall not be regarded as a violation of R.S. 23:1163. If the employee or the employee’s spouse actually pays premiums for health insurance, either as direct payments or as itemized deductions from their salaries, then this offset will only apply in the same percentage, if any, that the employer of the employee or the employer of his spouse paid the health insurance premiums.
 

 However, the medical expense offset provision is not self-operating; the employer must plead its offset and prove it with evidence showing that a payment of a certain amount of workers’ compensation claimant’s medical expenses was made by a person other than claimant, a relative or friend of the claimant.
 
 Lemons v. Georgia Pacific Corp.,
 
 42,950, p. 10 (La.App. 2 Cir. 2/13/08), 976 So.2d 307, 314,
 
 writ den.,
 
 08-0587, 08-0590 (La.5/2/08), 979 So.2d 1288, 1289.
 

 While this court has not addressed the issue, we note that other courts of appeal have ruled similarly to the Second Circuit.
 
 See Authement v. Wal-Mart,
 
 02-2434 (La.App. 1 Cir. 9/26/03), 857 So.2d 564 (employer not entitled to a statutory medical expense credit or setoff against workers’ compensation claimant’s medical expenses where employer did not set forth the extin-guishment of the claim as an affirmative defense and submit evidence at trial proving the amount of the credit);
 
 Alford v. Acadian Ambulance Service, Inc.,
 
 96-639 (La.App. 3 Cir. 11/6/96), 682 So.2d 942 (under workers’ compensation law credit for payment of medical expenses must be pleaded);
 
 Sears v. Berg Inc.,
 
 99-457 (La.App. 5 Cir. 9/28/99), 742 So.2d 760 (to be entitled to credit against medical expenses under workers’ compensation law employer must judicially assert its right to the credit and submit evidence at trial showing payment of a certain amount of claimant’s medical expenses, thereby proving amount of the credit).
 

 In light of the rulings of our brethren, we adopt the same principle of law. In
 
 *368
 
 order for American to have availed itself of the provisions of La. R.S. 23:1212, it had to plead the offset as an affirmative defense and prove the amount of the offset at trial. This it did not do, and therefore it is not entitled to the credit.
 

 As for the issue of mileage, generally a claimant can recover the costs incurred for medical treatment or evaluation. Pursuant to La. R.S. 23:1203 D:
 

 D. In addition, the employer shall be liable for the actual expenses reasonably and necessarily incurred by the employee for mileage reasonably and necessarily traveled by the employee in order to obtain the medical services, medicines, and prosthetic devices, which the employer is required to furnish under this Section, and for the vocational rehabilitation-related | ^mileage traveled by the employee at the direction of the employer. When the employee uses his own vehicle, he shall be he shall be reimbursed at the same rate per mile as established by the state of Louisiana for reimbursement of state employees for use of their personal vehicle on state business.
 

 Although Feingerts would be entitled to a reimbursement for his mileage, no evidence is present in the record on appeal to prove this element of damage. Therefore, we agree with American on this issue and amend the judgment accordingly.
 

 Feingerts has assigned four errors for our review. First, he contends that the OWC erred by failing to award supplement earnings benefits (“SEB”) or temporary total disability benefits (“TTD”). On the issue of indemnity and earning capacity, the OWC analyzed the documents entered into evidence by Fein-gerts and stated:
 

 From this evidence presented, this OWC Court can not determine the actual earnings of claimant. The claimant is the sole remaining officer of a law corporation.
 

 The federal corporate tax returns show the following:
 

 1999:
 

 Earnings paid to claimant: $150,000 But net operating loss of the corporation of-$42,419.
 

 2000:
 

 Earnings paid to claimant: $126,000 But net operating loss of the corporation of-$60,966.
 

 2001:
 

 Earnings paid to claimant: $24,000 But net operating loss of the corporation of-$99,889.
 

 117The federal Individual tax returns of claimant shed even less light on what his earnings were for these relevant periods of time.
 

 Based on this evidence, it cannot be definitely stated that for the year 2000, that claimant’s real earnings were $126,000.00. He was paid those amounts but the corporation was operating at a loss while the claimant was the sole person dictating the amount of salaries to be paid. It appears from this evidence that the corporation began to lose money in 1999 (-$42,419) and again in 2000 (-$60,966) and again (now post-accident) in 2001 accident. The corporation was spiraling downward prior to the accident.
 

 Based on “statement 4” of the 2002 Federal Corporate return, the corporation did not lose money in the prior years of 1994,1995, 1996,1997, and 1998 because no New Operating Loss (NOL)
 
 *369
 
 is listed as available for carryover in that 2002 return.
 

 The individual tax returns for claimant did show that he paid taxes on those amounts of income stated in the corporate federal returns. But, that does not make them the true earnings of the claimant who had the sole authority to direct the amount that he was to be paid. And, clearly if the corporation if [sic] operating at a loss, the amount of compensation being paid out is at question.
 

 Therefore, this OWC Court can not determine what actual earning loss was suffered by [claimant] as a result of this accident.
 

 After reviewing the same evidence, that being the various tax returns of Feingerts and his professional law corporation, we do not find that the OWC was clearly wrong or manifestly erroneous in this decision. Therefore, we find this assignment to be without merit.
 

 Feingerts’ second assignment of error concerns the OWC’s failure to award him medical benefits incurred for the treatment of his alleged lower back injury. The medical testimony both supported and refuted this claim. Again, we find this to be an issue of fact that is not manifestly erroneous.
 

 In his third assignment of error, Feingerts argues that the OWC erred by failing to award him the expenses incurred to have the 2007 brain scan. This scan [18was performed shortly after the first trial in Nevada. However, the scan was not introduced into evidence. Thus, the findings are not a part of the record on appeal, preventing Feingerts from carrying his burden of proof. We find that the OWC was correct in omitting this injury.
 

 Finally, Feingerts asserts that the OWC erred when it failed to award penalties and attorney’s fees for American’s failure to act on his demands for medical treatment and payment of disability benefits. In this regard, the OWC stated:
 

 No penalties were awarded and no attorney’s fees were awarded as defendant did reasonably controvert all issues.
 

 This is a finding of fact by the court based on the evidence in the record. We do not find it manifestly erroneous or clearly wrong.
 

 Based on the forgoing, we reverse the judgment in part with respect to the award for mileage, and amend the amount of medical expenses from $187,661.95 to $141,276.07. In all other respects, the judgment is affirmed.
 

 AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART; RENDERED.
 

 [1]
 

 . In its brief, American contends that the OWC found that Feingerts did not sustain a brain injury as a result of the accident; thus, it could not award medical expenses for mental confusion or concussion. American is incorrect. The OWC found that Feingerts sustained these two injuries but did not suffer from a permanent brain injury.
 

 [2]
 

 . Dr. Ferriss also recalled a particular conversation he had with the claimant and stated: "But I remember having the reaction my own self of, oh, my goodness, he’s trying to blame everything on the accident. That was what I thought to myself.”
 

 [3]
 

 . For example, Feingerts told Paul G. Harch, M.D. that he had his head on the steering wheel and had a bruise on his forehead that later diagnosed as a frontal sinus fracture. These claims are patently false and not supported by the record.
 

 [4]
 

 . Susan Andrews, Ph.D., and William Black, Ph.D., both neuropsychologists, performed objective neuropsychological evaluations on the claimant. Dr. Andrews testified that Fein-gerts suffered from an impaired functionality level as the result of the accident. On the other hand, Dr. Black testified that the results from his evaluation were inconsistent in a way that could not be explained. He concluded that he could not say “more probably than not” that the claimant’s psychiatric state was related to the accident. In fact, he believed that Feingerts was suffering from so-matoform disorder, a mental disorder characterized by physical symptoms that mimic physical disease or injury for which there is no identifiable physical cause. Instead, the symptoms that result from a somatoform disorder are due to mental factors. In people who have somatoform disorder, medical test results are either normal or don't explain the person’s symptoms. People who have this disorder may undergo several medical evaluations and tests to be sure that they do not have an illness related to a physical cause or central lesion, http://en.wikipedia.org/wiki/ Somatoform-disorder.
 

 [5]
 

 .
 
 See
 
 fn. 3 and 4,
 
 supra.
 
 Several of the doctors who testified found Feingerts overly focused on his various medical conditions and the lawsuits against American and the driver who was at fault for the accident.