CHARLES R. JONES, Judge.
 

 _[¿Pro
 
 se
 
 plaintiff, Carrie Merrill, appeals the judgment of the Office of Workers’ Compensation (“OWC”), dismissing her
 
 *282
 
 claim against Greyhound Lines, Inc. (“Greyhound”). We reverse and remand finding that the OWC erred in not finding that the degenerative disease Ms. Merrill presently suffers from was aggravated and caused to be symptomatic by her work-related injury.
 

 The facts surrounding Ms. Merrill’s work-place accident are not in dispute. In December 2006, Ms. Merrill, a Greyhound bus driver, injured her back in a fall down some stairs. Greyhound paid temporary total disability benefits to Ms. Merrill from December 2006, until March 4, 2007, at a rate of $282.91 per week. Greyhound discontinued paying disability benefits on the basis that Ms. Merrill was released to return to sedentary work. Ms. Merrill was offered sedentary employment with Greyhound in March 2006, but she declined the offer.
 

 Ms. Merrill filed a disputed claim for compensation in June 2007. The matter was brought for trial before the OWC on March 9, 2010.
 

 None of the doctors who treated or examined Ms. Merrill testified at trial. The medical records of Dr. R. Douglas Bostick, Dr. Bradley Bartholomew, Dr. Morteza Shamsnia, Dr. Michael Puente, and Dr. Robert Applebaum were |2introduced into evidence. Dr. Applebaum’s deposition was also introduced. The medical opinions presented by the parties were conflicting as to whether Ms. Merrill was able to return to work. The medical opinions were also conflicting as to whether Ms. Merrill’s continued complaints of pain, and need for back surgery were related to the accident or to degenerative changes in her back. Ms. Merrill argued that the work-related accident aggravated the pre-exist-ing condition in her back.
 

 Ms. Merrill testified that on the day of the accident, in connection with her job as a Greyhound bus driver, she was leaving a hotel in Houston on her way back to New Orleans. She testified that she “came down a flight of steps, hit the second step on the second flight of steps, and just fell down the rest of them.” She further testified that she landed on her back and immediately experienced back pain. On the bus ride back to New Orleans, Ms. Merrill was able to sit on a cushion, but stated that within an hour and fifteen minutes into the trip, she began to have pain all over her body.
 

 Upon her return to New Orleans, Ms. Merrill reported the incident to her supervisor, Oscar Washington, and notified the hotel of the incident. She subsequently sought medical treatment at the University Medical Center emergency room. In January 2007, she began treating with Dr. Bostick, an orthopedist. Thereafter, Ms. Merrill treated with neurologist, Dr. Shamsnia, and neurosurgeon, Dr. Bartholomew. Throughout her treatment, Ms. Merrill complained of pain in her back, neck, and shoulders, radiating to both arms. At Greyhound’s request, Ms. Merrill was examined by neurologist, Dr. Puente, and neurosurgeon, Dr. Appleb-aum, wherein she related the same complaints of pain.
 

 | ¡¡Ms. Merrill denied any prior injury to her neck. She testified as to two previous minor traffic accidents that caused her to experience low back pain, but specific details were not elicited. No evidence of prior medical treatment for back or neck injuries was presented.
 

 Ms. Merrill testified that before the December 24, 2006 accident, she experienced only regular backaches if she lifted unusually heavy pieces of luggage. On those occasions, she stated she would take an over-the-counter medication and would always return to work.
 

 
 *283
 
 At the time of the accident, Ms. Merrill worked as a bus driver for Greyhound for seven years without any documented neck or back problems. She explained that her daily duties included loading the bus, with luggage that could weigh up to seventy pounds. Her eight hour days also included driving the bus, as far as Atlanta or Houston.
 

 Finally, Ms. Merrill testified that she could not go back to picking up fifty to sixty pound luggage as she did when driving for Greyhound. She stated that she believed she could work at a desk job if she was permitted to get up and walk around. When asked why she did not accept the sedentary position offered by Greyhound in March 2006, Ms. Merrill explained that at the time (three months after the accident) nobody knew what was wrong with her.
 

 The OWC rendered judgment on March 24, 2010, dismissing the claim of Ms. Merrill against Greyhound with prejudice, finding that Ms. Merrill was no longer entitled to indemnity benefits beyond that which had been paid. The OWC further determined that Ms. Merrill’s need for surgery was related solely to degenerative changes in her back and were not related to her soft tissue job injury. Ms. Merrill’s timely appeal followed.
 

 j4It is a well-settled principle that the provisions of the workers’ compensation scheme should be liberally interpreted in favor of the worker.
 
 Dellavalle v. Dynegy Midstream Services,
 
 2002-2479, p. 3 (La.App. 4 Cir. 5/28/03), 848 So.2d 716, 718, citing
 
 Bynum v. Capital City Press, Inc.,
 
 95-1395 p. 5-6 (La.7/2/96), 676 So.2d 582, 586.
 

 The appropriate standard of review to be applied by the appellate court to the OWC’s findings of fact is the “manifest error-elearly wrong” standard.
 
 Dean v. Southmark Construction,
 
 2003-1051, p. 7 (La.7/6/04), 879 So.2d 112, 117. Accordingly, the findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety.
 
 Alexander v. Pellerin Marble & Granite,
 
 93-1698 (La.1/14/94), 630 So.2d 706. If the factfin-der’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the fact-finder, it would have weighed the evidence differently.
 
 Banks v. Industrial Roofing & Sheet Metal Works, Inc.,
 
 96-2840, pp. 7-8 (La.7/1/97), 696 So.2d 551, 556.
 

 Deference is due to the factfinder’s determinations regarding the credibility of witnesses “for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.”
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review even though the appellate court may feel that its own evaluations and inferences are more reasonable.
 
 Stobart v. State, through DOTD,
 
 617 So.2d 880 (La.1993).
 

 lfiWe note that Ms. Merrill has filed a
 
 pro se
 
 brief, which does not comport with the requirements of Rule 2-12.4, and it is unclear to us what her specific assignments of error are. Rule 2-12.4 of the Uniform Rules-Courts of Appeal requires an appellant’s brief to comply with certain requirements. The brief must include, among other things:
 

 a concise statement of the case, the ruling or action of the trial court thereon, a specification or assignment of alleged errors relied upon, the issues presented for review, an argument confined strictly to the issues of the case free from un
 
 *284
 
 necessary repetition, giving accurate citations of the pages of the record and the authorities cited and a short conclusion stating the precise relief sought.
 

 Rule 2-12.4, Uniform Rules-Courts of Appeal. The Rule further provides that “[a]ll specifications or assignments of error must be briefed.”
 
 Id.
 
 If they are not briefed, “[t]he court may consider as abandoned any specification or assignment of error which has not been briefed.”
 
 Id.
 
 However, because Ms. Merrill is representing herself, we will examine the record using the applicable standard of review to determine whether the OWC erred.
 

 An employee is entitled to compensation benefits if he suffers a personal injury by an accident arising out of and in the course of employment. La. R.S. 23:1031. The Supreme Court has stated that under this statute a successful claimant’s proof must show personal injury which is the result of an accident, which accident arises out of and in the course of employment.
 
 Buxton v. Iowa Police Department,
 
 2009-0520, pp. 11-12 (La.10/20/09), 23 So.3d 275, 283. The chain of causation required by the statutory scheme as adopted by the legislature in La. R.S. 23:1031 is that the employment causes the accident, the accident causes injury, and the injury causes disability. The employee has the burden of proving, |fiby a preponderance of the evidence, that the resulting disability is related to an on-the-job injury.
 
 Id.
 
 at p. 12, 23 So.3d at 283;
 
 See also Feingerts v. American Cas. Co. of Reading,
 
 2009-1209 (La.App. 4 Cir. 3/10/10), 34 So.3d 358.
 

 Even if the claimant suffered from a pre-existing medical condition, he may still meet his burden of proof of causation if he proves that the accident aggravated, accelerated, or combined with the pre-existing condition to produce an injury resulting in a compensable disability.
 
 Pev-eto v. WHC Contractors,
 
 93-1402 (La.1/14/94), 630 So.2d 689. The claimant may be aided in meeting the foregoing burden by a presumption of causation, if he can prove that before the accident he had not manifested disabling symptoms, that such symptoms commenced with the accident and manifested themselves thereafter, and that either medical or circumstantial evidence indicates a reasonable possibility of causal connection between the accident and the onset of the disabling symptoms.
 
 Walton v. Normandy Village Homes Association, Inc.,
 
 475 So.2d 320, 324-25 (La.1985). Once the claimant has established the presumption of causation, the opposing party bears the burden of producing evidence and persuading the trier of fact that it is more probable than not that the work injury did not accelerate, aggravate or combine with the pre-existing condition to produce the employee’s disability.
 
 Peveto,
 
 93-1402 at pp. 2-3, 630 So.2d at 691.
 

 After our thorough review of the record in the present case, particularly in light of the medical evidence outlined below, we find that the OWC erred in ruling against Ms. Merrill. More specifically, we find that the medical evidence clearly demonstrates that Ms. Merrill’s work-related accident caused an aggravation of a preexisting condition in her back, which necessitates surgery.
 

 |7Ms. Merrill was seen by five (5) physicians during the course of her treatment: Dr. R. Douglas Bostick (orthopedist), Dr. Morteza Shamsnia (neurologist), Dr. Bradley Bartholomew (neurosurgeon), Dr. Michael Puente (neurologist), and Dr. Robert Applebaum (neurosurgeon). While Ms. Merrill presented herself for treatment with Doctors Bostick, Bartholomew and Shamsnia, Dr. Puente and Dr. Applebaum were doctors hired by a workers compensation insurer to examine Ms. Merrill.
 

 
 *285
 
 Dr. Bostick, an orthopedist, treated Ms. Merrill from January 2007 to May 2007. Dr. Bostick suspected that degenerative disc changes had occurred. An MRI revealed that there were changes from cervical spondylosis with focal disc herniations causing ventral cord deformity at the C3-C4 and C4-C5 level, but there was no canal stenosis and multilevel neural fora-minal stenosis. He determined that the MRI results were “consistent with cervical disc disease at C4-5 and 5-6.” Throughout the course of her treatment, she complained of pain radiating down her right arm — especially in her shoulder — coming from the neck, and her pain did not subside. He discussed cervical epidural steroid injections as a possible treatment, but Ms. Merrill was not interested in this type of treatment. He informed her that she could perform sedentary work.
 

 Dr. Shamsnia, a neurologist, treated Ms. Merrill from April 2007 to late January 2010. Ms. Merrill complained of suffering from pain consistently in her neck and lower back as well as shoulder pain radiating to her right arm. She suffered with muscle spasms in her right shoulder and tingling in her arms down to her fingertips. He found that her neck pain and right upper arm parasthesis was the result of her fall at work. She also complained of cervical pain radiating to both shoulders. He found that she was in severe pain and that she was unable to work. |s She was prescribed pain medication throughout the time she treated with Dr. Shamsnia. As a result of a myeleogram performed on October 21, 2009, he found evidence of a disc protrusion at C2-3, C3^4, and C4-5 level, involvement of the nerve root at C5-6 and C6-7 bilaterally. He also found evidence of some degenerative changes in the spine.
 

 Dr. Bartholomew treated Ms. Merrill three times in a time period ranging from September 2008 to November 2009. She presented for treatment with Dr. Bartholomew complaining of continuing neck pain, and shooting pain to both her upper extremities and her fingers. She also suffered from constant posterior cervical pain going to the right shoulder area, with pain occasionally going to the left side. She consistently complained of neck pain, and pain in her upper extremities. She denied any past medical issues regarding her neck. As a result of some diagnostic tests, Dr. Bartholomew reached the following conclusions:
 

 MRI report from 1/31/07 of the cervical spine shows a C2-3 focal protrusion, a C3-4 central herniation, C5-6 focal herniation to the left with deformity of the left cord, C5-6 loss of height and disc osteophyte complex, and a C6-7 mild bulge. I reviewed these films and agree with the findings. EMGs and nerve conduction on 3/4/07 showed right cervical radiculopathy. MRI scan report with flexion and extension of the cervical spine from 4/14/08 described C2-3 contained subligamentous herniation, a C3-4 prominent herniation, a C4-5 herniation, and C5-6 herniation to the left and C6-7 changes. There were also maybe some occipital cervical changes. I reviewed these films and agree with the findings.
 

 Additionally, a discogram indicated that the C5-6 level was causing her symptoms and he recommended a C5-6 artificial disc surgery. He also reviewed a myelogram performed on October 21, 2009, and indicated in his reports that the myelograms results showed protrusion at C2-3 through C5-6 with a C5-6 |3disco/osteophyste complex with slightly less extreme findings of the same at C6-7. Dr. Bartholomew opined that degenerative changes were most noticeable at C5-6 and C6-7 levels.
 

 Dr. Puente examined Ms. Merrill three times, once in 2007 and twice in 2008. She
 
 *286
 
 complained to him of pain in her shoulders, arms and hands, and more specifically complained of pain in both her right shoulder and hand. Dr. Puente determined that Ms. Merrill did have diffuse degenerative changes of the cervical spine that were of “chronic origin” and were not attributable to her work related injury. He noted no tenderness to the neck area, normal strength in both upper extremities, and no atrophy. He also concluded that Ms. Merrill did have occasional neck pain.
 

 Lastly, Dr. Applebaum examined Ms. Merrill one time in September of 2009. She complained of pain in her neck, right shoulder and both hands. She also stated that she experienced tingling around her right elbow. She explained that she did not experience these problems prior to her December 2006 accident. Dr. Applebaum noted that she had minimal limitation of motion present in the neck, and some rigidity present in the cervical spine mainly in the left trapezius muscle. He also found compression of the cervical spine reproduced some pain at the base of the neck. He testified that he later reviewed the results of Ms. Merrill’s myelogram of October 21, 2009, and opined that she had a degenerative disease, the worst level being C5-6. He further testified that this disease possibly warranted a fusion instead of an artificial disc replacement that Dr. Bartholomew recommended. He testified that the need for surgery was related to her degenerative condition, not the December accident.
 

 |inIn his testimony, Dr. Applebaum acknowledged that the work-related injury could have certainly aggravated or accelerated the degenerative changes in Ms. Merrill’s back, but that it would have resolved in three to six months since it was generally a “soft tissue injury”. In sum, Dr. Applebaum testified that the work-related accident caused a “temporary” aggravation of her pre-existing condition.
 

 The medical evidence does not indicate, as stated by Dr. Applebaum, that Ms. Merrill suffered a “soft tissue injury” in the December 24, 2006 accident, which would have resolved in three to six months. In fact, none of the physicians involved in this case made a diagnosis of “soft tissue injury”. The only reference to a “soft tissue injury” in this record is found in Dr. Applebaum’s deposition.
 

 Contrary to Dr. Applebaum’s statements concerning “soft tissue injury”, the January 31, 2007 MRI (conducted approximately one month after the accident) showed objective findings of disc bulging and her-niations in Ms. Merrill’s cervical spine. Similar objective findings were noted in subsequent diagnostic tests. The record also documents that on September 25, 2008 (ten months after the accident), Dr. Bartholomew expressed his opinion that Ms. Merrill’s work-related accident aggravated her pre-existing degenerative changes and caused herniation.
 

 It is undisputed that Ms. Merrill suffers from a degenerative spinal disease. However, the record reveals that she was asymptomatic before the accident. Ms. Merrill’s symptoms of back, neck and shoulder pain — radiating into both arms and hands — began almost immediately after the accident, and were consistently expressed and documented in the report of every doctor for more than three years. Additionally, there is no medical evidence in the record to establish that Ms. Merrill’s work-related injury has resolved, or that an aggravation of her pre-existing degenerative condition was limited in duration. Ms. Merrill’s testimony |nthat she was in good health prior to the accident was clearly supported by the fact that she performed her job, which included a certain amount of heavy lifting and long periods of driving, without any problems. The record reflects no contradictions or incon
 
 *287
 
 sistencies in Ms. Merrill’s testimony to indicate that her credibility was called into question.
 

 Based on the totality of evidence, we conclude that Ms. Merrill met her burden of proving by a preponderance of the evidence that her work-related accident caused an aggravation of her pre-existing back condition. Having met that burden, it then became Greyhound’s burden to rebut the legal presumption afforded Ms. Merrill, by producing evidence that it is more probable than not that the work-related injury did not accelerate, aggravate or combine with the pre-existing disease or infirmity to produce the claimant’s disability.
 
 See Peveto,
 
 93-1402, pp. 2-3, 630 So.2d at 691;
 
 Walton,
 
 475 So.2d at 325. Greyhound presented no such evidence. Accordingly, the OWC’s ruling, that Ms. Merrill’s need for surgery was related solely to degenerative changes in her back and not to her work-related injury, is not supported by the record and is clearly wrong.
 

 DECREE
 

 For the foregoing reasons, we reverse the judgment of the OWC and remand for further proceedings.
 

 REVERSED AND REMANDED.